**UNITED STATES of America, Appellee,**

v.

**Ronald BELLETIERE, Appellant.**

No. 91–5615.

United States Court of Appeals,
Third Circuit.

Argued March 9, 1992.
Decided July 22, 1992.

Leonard A. Sands (argued), Sands & Moskowitz, Coconut Grove, Fla., for appellant.

James J. West, U.S. Atty., Malachy E. Mannion (argued), Asst. U.S. Atty., Chief, Organized Crime Drug Enforcement Task Force, Scranton, Pa., for appellee.

Present: HUTCHINSON, ALITO and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellant Ronald Belletiere (Belletiere) appeals his sentence for drug-related offenses. Belletiere argues that the district court erred in applying the United States Sentencing Guidelines in three respects. First, Belletiere argues that the district court erred in adjusting his base offense level upward by two levels pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. Second, he argues that the district court erred in adjusting his base offense level upward by four levels pursuant to U.S.S.G. § 3B1.1(a) for being a leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive. Finally, Belletiere argues that the district court erred in its calculation of the amount of cocaine involved in this case and its resulting use of a base offense level of 32 under the Sentencing Guidelines. We agree with Belletiere's first two contentions and will therefore vacate the district court's judgment of sentence and remand for resentencing, but we do not believe the district court clearly erred in its calculation of the amount of cocaine involved and will therefore affirm the district court's application of a base offense level of 32.

## I.

On June 5, 1990, Belletiere was indicted for drug-related offenses by a grand jury sitting in the United States District Court for the Middle District of Pennsylvania. The indictment charged that from 1986 to 1988 Belletiere conspired with others to distribute and possess with intent to distribute varying quantities of cocaine in the Hazleton, Pennsylvania area. The indictment also charged that Belletiere's home in Miami, Florida and two Mercedes Benz automobiles were subject to forfeiture by the government because they had been used by Belletiere to commit or facilitate the commission of the drug-related offenses.

On July 5, 1990, Belletiere quit-claimed his interest in the Miami home to his estranged wife, Scarlett Belletiere, as part of a separation agreement for a nominal consideration of $10.00.[1] Belletiere says the transfer of interest took place with full disclosure of the government's pending for-

---

1. Neither the quit-claim deed nor the separation agreement were made a part of the record in this case. At the sentencing hearing, however, Belletiere's counsel informed the district court that the quit-claim was part of a separation agreement between Belletiere and his estranged wife and was a publicly-recorded transfer of interest. The government did not object to these statements by Belletiere's counsel at the sentencing hearing.

feiture claims to Belletiere's wife and her counsel. On July 11, 1990, Belletiere was arraigned and entered a plea of not guilty.

On November 29, 1990, the government filed a superseding indictment that added two counts of tax evasion. On April 12, 1991, after a one-week trial, a jury found Belletiere guilty on all counts. The jury also found that Belletiere's interest in his home in Miami, Florida and his interest in the two Mercedes Benz automobiles were forfeit to the United States. On April 22, 1991, the district court ordered the forfeiture of Belletiere's property.

Belletiere was at first permitted to remain free on bail until his sentencing on July 18, 1991. On April 23, 1991, however, after informing his probation officer that he did not personally use drugs, Belletiere was subjected to a random drug screening and tested positive for cocaine use. On request of the government, Belletiere's bail was revoked and he was taken into custody.

In the Presentence Report, the probation officer recommended that the district court adjust Belletiere's sentence upward for two reasons. The probation officer recommended that an upward adjustment of two levels was appropriate for obstruction of justice pursuant to Sentencing Guideline section 3C1.1. The Report stated:

Adjustment for Obstruction of Justice: The defendant willfully attempted to obstruct or impede the administration of justice. On June 5, 1990, Ronald Belletiere was indicted on multiple drug offenses by a Grand Jury sitting in the Middle District of Pennsylvania. Included in the indictment were provisions to forfeit two Mercedes Benz automobiles and a residence.... The residence was jointly owned by the defendant and his wife, Scarlett Belletiere. On July 5, 1990, Ronald Belletiere quit-claimed the property to his then-estranged wife, Scarlett Belletiere, in consideration for the sum of $10. The defendant transferred this property fully knowing it was subject to forfeiture. The defendant further attempted to impede or obstruct the administration of justice by making a false statement to the Probation Officer about drug use following his conviction. Though a drug screen submitted by the defendant on April 23, 1991, tested "positive" for cocaine, Ronald Belletiere attempted to mislead the Probation Officer by denying the recent use of cocaine. Pursuant to Section 3C1.1, two levels are added.

Government's Supplemental Appendix (Supp.App.) at 357.

The probation officer also recommended that the court adjust Belletiere's sentence upward by four levels based on Belletiere's leadership role in the offense pursuant to Sentencing Guideline section 3B1.1(a). The Presentence Report stated:

Adjustment for Role in Offense: Ronald Belletiere was the leader of an extensive cocaine trafficking operation that involved five or more participants. He exercised decision making authority, established prices, and supplied multi-kilograms of cocaine for redistribution. Charles Craig, Neal DeAngelo, Paul DeAngelo, Neal Forte, David Mishinski, and James Yurkovic are identified as other participants. Pursuant to Section 3B1.1(a), four levels are added.

Supp.App. at 357.

Counsel for Belletiere objected to these upward adjustments. In addition, on June 6, 1991 the lawyer representing Belletiere in connection with his marital problems sent a letter to the Probation Officer concerning the quit-claim of the house to Mrs. Belletiere. The letter stated, in relevant part:

As discussed with you in the above-referenced telephone conversation, this correspondence will serve to confirm that Mr. Belletiere had no intention of "obstructing justice" by quit-claiming his interest in the former marital home to his wife and that it was undertaken with full disclosure to the wife and her counsel of the pending forfeiture claims by the government.

As you may know, accusations run wild in divorce cases and Mr. Belletiere acquiesced to transferring his interest in the property, again with full disclosure

of the pending forfeiture claims, solely to placate his wife and to resolve his family issues on an amicable basis.

Appellant's Appendix (App.) at 92.[2]

After receiving Belletiere's objections to the Report, the probation officer included an addendum to the Report that basically reiterated the officer's reasons for imposing the upward adjustments:

> [In regard to section 3B1.1(a), b]ased upon information furnished by the Government, the Probation Officer concludes that Ronald Belletiere was the leader of a cocaine trafficking operation that involved five or more participants. He exercised a high degree of decision making authority in organizing a number of cocaine shipments from Miami to Hazelton [sic], and determining prices. The scope of the illegal drug activity was broad, continuing over a two year period....
>
> ....
>
> ... [In regard to section 3C1.1,] Ronald Belletiere was fully aware that the marital residence was subject to forfeiture by the Government. He transferred the property to his estranged wife to divest himself of any interest in the property.

Supp.App. at 363A–64.

On July 18, 1991, after hearing argument from counsel, the district court adopted the recommendations of the probation officer without making any independent factual findings of its own and determined pursuant to the Sentencing Guidelines that Belletiere's base offense level was 32 and total adjusted offense level was 38. With a criminal history category of I, Belletiere was sentenced by the district court to imprisonment for 235 months, the lower end of the sentencing range specified by the Guidelines, to be served concurrently with lesser sentences on the other counts. Belletiere filed a timely notice of appeal from the judgment and sentence on July 18, 1991.

## II.

We have appellate jurisdiction over this appeal from the final decision of the district court by virtue of 28 U.S.C.A. § 1291 (West Supp.1992). The district court had subject matter jurisdiction in this criminal matter. *See* 18 U.S.C.A. § 3231 (West 1985).

We review the district court's factual findings in relation to sentencing issues for clear error. *United States v. Murillo*, 933 F.2d 195, 198 (3d Cir.1991). This standard applies to a district court's factual determinations that a defendant willfully obstructed justice pursuant to Sentencing Guideline section 3C1.1, *United States v. Cusumano*, 943 F.2d 305, 315 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992), *see United States v. McDowell*, 888 F.2d 285, 292 (3d Cir. 1989), and played an aggravating role pursuant to Guideline section 3B1.1, *United States v. Phillips*, 959 F.2d 1187, 1191 (3d Cir.1992). Our standard of review of the court's application and interpretation of the Sentencing Guidelines is plenary. *Murillo*, 933 F.2d at 197; *McDowell*, 888 F.2d at 291–92. Where the district court's finding involves a mixed question of law and fact, our standard and scope of review "takes on greater scrutiny, approaching *de novo* review as the issue moves from one of strictly fact to one of strictly law." *Murillo*, 933 F.2d at 198.

---

**2.** It is not clear whether this letter was made a part of the record in the district court. The letter was originally sent by Belletiere's marital counsel directly to the probation officer and, according to counsel for Belletiere, was then appended to the final version of the Presentence Report that went to the district court. Neither the copy of the Presentence Report forwarded to us by the clerk of the district court nor the copy reproduced in the government's appendix have a copy of the letter appended to it, and at oral argument counsel for the government stated that he had not seen the letter until it was reproduced separately in appellant's appendix. Counsel for Belletiere mentioned the letter during the sentencing hearing but did not introduce it as an exhibit. Because the government failed to introduce any evidence tending to show that Belletiere willfully intended to obstruct justice or attempt to obstruct justice, we need not and do not rely on this letter in deciding the obstruction of justice issue.

## III.

We will first address Belletiere's argument that the district court erred in increasing his base offense level by two levels for obstruction of justice pursuant to Sentencing Guideline section 3C1.1. That section provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

United States Sentencing Commission, *Guidelines Manual*, § 3C1.1 (Nov.1991).

In the recent case of *United States v. McDowell,* we held that "a sentencing court considering an adjustment of the offense level need only base its determination on the preponderance of the evidence with which it is presented." *McDowell,* 888 F.2d at 291 (citation omitted). Because the government is the party seeking to upwardly adjust Belletiere's sentence, the government bears the burden of proving by a preponderance of the evidence that the defendant *willfully* obstructed or impeded, or *willfully* attempted to obstruct or impede, the administration of justice. *See United States v. Perdomo,* 927 F.2d 111, 117–18 (2d Cir.1991) (government must prove conduct which serves as basis for upwards adjustment by preponderance of evidence). The government bears the ultimate burden of persuasion on this issue; "[t]his prevents the criminal defendant from having to 'prove a negative' in order to avoid a stiffer sentence." *McDowell,* 888 F.2d at 291.

In its brief, the government argues that Belletiere attempted to obstruct justice pursuant to Sentencing Guideline 3C1.1 when he quit-claimed his interest in the residence to his estranged wife. The government contends that the fact that Belletiere quit-claimed his interest in the residence knowing that it was subject to forfeiture, joined with other facts of record, permit a finding of obstruction. The other facts are that Belletiere received only $10.00 in exchange for the deed, failed to notify the government or court of the transfer, made the transfer just prior to his arraignment and did not transfer any of the other property subject to forfeiture. The government thus concludes that this "is a thinly veiled fraud" on the court and constitutes clear evidence of an "obvious attempt [by Belletiere] to make it more difficult for the Government to gain the property." Brief for Appellee at 15–16. The government concedes as it must that the quit-claim deed will have no real effect on the government's ability to gain the property through forfeiture, but argues that Belletiere need only attempt, not necessarily succeed, to obstruct justice to earn an upward adjustment under section 3C1.1.

Section 3C1.1 plainly requires that the defendant act "willfully" in obstructing or impeding, or attempting to obstruct or impede, the administration of justice. The Supreme Court of the United States has defined the word "willful" as follows:

> [T]he word [willful] denotes an act which is intentional rather than accidental. But "when used in a criminal statute, it generally means an act done with a bad purpose." In that event something more is required than the doing of the act proscribed by the statute. An evil motive to accomplish that which the statute condemns becomes a constituent element of the crime.

*Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (citations omitted). Thus, in order to receive an upward adjustment pursuant to section 3C1.1, the government must prove by a preponderance of the evidence that Belletiere *intentionally* obstructed or attempted to obstruct justice. *See United States v. Tabares,* 951 F.2d 405, 411 (1st Cir.1991) (Guideline 3C1.1 contains requirement that defendant act "willfully" in obstructing justice); *United States v. Altman,* 901 F.2d 1161, 1164 (2d Cir.1990) (to act "willfully," defendant must consciously act with purpose of obstructing justice).

We believe the government failed to prove by a preponderance of the evidence that Belletiere "willfully" attempted to obstruct justice by quit-claiming his interest in the residence to his estranged wife. The

only references in the record as to why Belletiere quit-claimed his interest is his counsel's statements at the sentencing hearing that Belletiere quit-claimed the property to his estranged wife and then publicly recorded the deed in an effort to resolve his ongoing marital problems concerning a separation agreement between him and his estranged wife. Even if these statements are not considered, the government failed to introduce any evidence that could have made it more likely than not that Belletiere "willfully" attempted to obstruct justice. Because of this lack of evidence, the government failed to meet its burden of proving that Belletiere "willfully" attempted to obstruct justice by quit-claiming his interest in the Miami home to his wife. Accordingly, we hold that the district court clearly erred in adjusting Belletiere's base level upwards by two levels for obstruction of justice pursuant to section 3C1.1. *See United States v. Thomas–Hamilton*, 907 F.2d 282, 285–86 (2d Cir. 1990) (government failed to introduce evidence that defendant made threat to probation officer with intent to obstruct justice). We also note the lack of any factual finding by the district court that Belletiere acted willfully. *See Perdomo*, 927 F.2d at 117 n. 3 & 118 (district court erred in adjusting sentence upward for obstruction of justice without making factual finding that defendant intended to obstruct justice when he hid drugs and made misstatements to probation officer).

This situation differs from the cases relied on by the government where the property subject to forfeiture was transferred to a third party and could not be located or traced. They involve cash transactions or concealments of stolen property or drugs. *See, e.g., United States v. Brown*, 944 F.2d 1377, 1379, 1383 (7th Cir.1991) (defendant who gave drug proceeds of $35,000.00 in cash and securities to co-conspirator, who then disappeared, to pay for defense after

learning of criminal investigation with the case obstructed justice); *United States v. Dortch*, 923 F.2d 629, 632 (8th Cir.1991) (tossing bag of cocaine out of car window when police approached was "deliberate attempt to conceal or destroy material evidence from police [sic] within the meaning of Guidelines § 3C1.1").[3] The property Belletiere transferred was real property, as opposed to a chattel which can be readily concealed and is hard to trace. Moreover, Belletiere transferred only whatever interest he might have had by way of quit-claim and recorded the deed on the public record; the property remained subject to forfeiture by the government and both Mrs. Belletiere and her lawyer were informed of the pending forfeiture claim. The evidence relied on by the government does not make it more likely than not that Belletiere "willfully" attempted to obstruct justice by quit-claiming his interest in the property to his estranged wife.

Instead, this case is similar to *United States v. Thomas–Hamilton*. There, the parole officer recommended that the defendant receive a two-level obstruction adjustment pursuant to section 3C1.1 because the defendant had a poor attendance record at a required counseling center, threatened a counselor with bodily injury after being told that she was not being discharged from the counseling program and denied her identity to a parole officer making a field investigation at a laundromat. *Thomas–Hamilton*, 907 F.2d at 283, 285. The United States Court of Appeals for the Second Circuit reviewed the record and stated:

> Even were we to accept the government's recitation of the events in question, there is simply no indication whatsoever that Thomas–Hamilton's alleged threat was made with the *purpose* of obstructing justice. The alleged conduct, while indeed reprehensible, may simply have been intended to effect a relaxation

---

**3.** Application note 3(d) in the commentary to section 3C1.1, effective as of November 1, 1990, states that a defendant's attempt to destroy or conceal evidence contemporaneously with arrest is not enough standing alone to warrant adjustment unless the attempt resulted in mate-

rial hindrance to investigation, prosecution or sentencing. The issue of the effect of the amended application note has not been presented to us and therefore we express no opinion on its impact on Belletiere's case.

of the defendant's obligation, pending sentencing, to report to drug treatment counseling. Such conduct, which might have justified a revocation of the defendant's bail or even separate criminal prosecution, cannot, based on the present record, be equated with a "willful[ ] interfere[nce] with the disposition of criminal charges."

*Id.* at 286. The evidence introduced by the government in this case similarly failed to prove that Belletiere intentionally attempted to obstruct justice by quit-claiming his interest in the house.

■ The second ground set forth in the Probation Report to justify an upward adjustment based on obstruction of justice in the Probation Report was Belletiere's misrepresentation to the parole officer that he never personally used drugs, a misrepresentation established when he tested positive for cocaine use during a random drug test while he was free on bail awaiting sentence. Belletiere argues that the district court may have used this as a ground for a section 3C1.1 upward adjustment.

At the sentencing hearing, Belletiere objected to the government's use of this misstatement as a ground for a section 3C1.1 upward adjustment. The district court, however, declined to hear argument from Belletiere's counsel on the point:

> MR. SANDS: The other basis for asking the Court to enhance two levels for obstruction of justice, is the Probation Officer's view that there has been a material misstatement to the Probation Office that the defendant does not use drugs, and there was this one positive drug screening.
>
> First of all—
>
> THE COURT: You don't have to address that one, I agree. That's post offense anyway. Post offense and post trial.
>
> MR. SANDS: Okay.
>
> THE COURT: So I wouldn't address that one. Okay.

App. at 62. In response, the government's counsel stated:

> MR. MANNION: I understand the Court has indicated that it doesn't agree with the Government's other proposition as for obstruction, so I won't really spend much time as to say that I think that because the defendant had told Probation he was not using cocaine and [gave a positive urine] sample, even though it was post conviction that the Court can consider that.
>
> THE COURT: Okay.

*Id.* at 73–74. The district court apparently interpreted section 3C1.1 as applying only to conduct that obstructed or attempted to obstruct "the *instant* offense," U.S.S.G. § 3C1.1 (emphasis added), and not conduct outside the charged offense, such as the misstatement about Belletiere's personal cocaine use. Indeed, the government did not strongly disagree with that interpretation. Unfortunately, the district court never clearly said that it would not consider the misstatement as a basis for a section 3C1.1 upward adjustment before it overruled Belletiere's objections to the Presentence Report "for the reasons offered by the Probation Officer." *Id.* at 81. We are therefore left with an ambiguous record on whether the district court considered the misstatement in making an upward adjustment to Belletiere's sentence.[4]

Assuming the district court did accept this misstatement as a ground for a two-level increase based on obstruction of justice, we hold it erred in doing so. Section 3C1.1 applies to willful obstruction or attempt to obstruct "the administration of justice during the ... sentencing of the *instant* offense." U.S.S.G. § 3C1.1 (emphasis added). "Any interpretation other than that § 3C1.1 refers to efforts to obstruct the prosecution of the conviction offense would only render this modifier meaningless." *Perdomo*, 927 F.2d at 118; *see United States v. Barry*, 938 F.2d 1327, 1333 (D.C.Cir.1991) (listing cases interpreting "instant offense" to mean offense of

---

**4.** We are not without sympathy for the burden placed on district courts by the hearings the Sentencing Guidelines require. Nevertheless, this type of problem demonstrates the impor-

tance of a district court's statement on the record of its specific factual findings and legal conclusions in connection with sentencing.

conviction for purposes of section 3C1.1); *Dortch*, 923 F.2d at 632 ("instant offense" in section 3C1.1 means offense of conviction); *cf. Murillo*, 933 F.2d at 199 (holding and citing other cases holding that the "common sense reading of 'the offense' as used in § 3B1.1 is 'the offense of conviction' ").

The commentary to section 3C1.1 makes it clear that the section's focus is on willful acts or statements intended to obstruct or impede the government's investigation of the offense at issue. *See Tabares*, 951 F.2d at 411; *Perdomo*, 927 F.2d at 118. We fail to see how this false statement could have impeded the government's sentencing investigation in this case. Belletiere's misstatement had nothing to do with the offenses for which he was convicted. Furthermore, the misstatement was not material to the probation officer's investigation in this particular case.

The commentary to section 3C1.1 gives examples of the type of conduct to which this section applies, including "providing materially false information to a probation officer in respect to a presentence or other investigation for the court," U.S.S.G. § 3C1.1 comment. (n.3(h)).[5] Regardless of what Belletiere told the probation officer concerning his personal drug use, the probation officer was free to routinely test Belletiere for drugs. He did so and performed two random tests on Belletiere, one of which was positive. When Belletiere failed the test, the government revoked his bail as punishment, a punishment justified by Belletiere's separate illegal conduct. *See Thomas–Hamilton*, 907 F.2d at 286. Belletiere's false statement to the probation officer was not relevant to the presentencing investigation of the conviction offenses, and it was error for the court to adjust his sentence upward under section 3C1.1 either on this basis or because he quit-claimed his interest in his home to his wife.[6]

## IV.

■ We turn now to Belletiere's argument that the district court erred in adjusting his sentence upward by four levels pursuant to section 3B1.1(a) of the Sentencing Guidelines, which provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

U.S.S.G. § 3B1.1(a). In the Presentencing Report, the probation officer recommended such an upward adjustment, stating:

Adjustment for Role in the Offense: Ronald Belletiere was the leader of an extensive cocaine trafficking operation that involved five or more participants. He exercised decision making authority, established prices, and supplied multi-kilograms of cocaine for redistribution. Charles Craig, Neal DeAngelo, Paul DeAngelo, Neal Forte, David Mishinski, and James Yurkovic are identified as oth-

---

5. The application notes contain a specific definition of statements that are "material" for purposes of section 3C1.1:

"Material" evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination.

U.S.S.G. § 3C1.1 comment. (n.5). We note that the cases cited by the concurrence on this issue all predate the Sentencing Guidelines.

6. Section 3C1.1 is intended to penalize the defendant for material misstatements concerning the conviction offense, not other crimes the defendant may have committed but does not want to admit. We note that section 5H1.4 of the Sentencing Guidelines "penalizes" a defen-

dant who also happens to be a substance abuser by requiring the defendant to submit to a treatment program.

Our position on this issue is further supported by the recent addition of application note 1 in the commentary to section 3C1.1. It states, in relevant part:

This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt ... [or] refusal to admit guilt or provide information to a probation officer ... is not a basis for application of this provision. In applying this provision in respect to alleged false ... statements by the defendant, such ... statements should be evaluated in a light most favorable to the defendant.

U.S.S.G. § 3C1.1 comment. (n.1).

er participants. Pursuant to Section 3B1.1(a), four levels are added.

Supp.App. at 357. On appeal, Belletiere argues the district court erred in adding four levels to his base level pursuant to section 3B1.1(a) because the evidence at trial demonstrated that he was merely a drug dealer who sold cocaine in separate transactions to several individuals, who in turn used or resold the drugs to others without Belletiere's control or interference and also purchased drugs from sources in addition to Belletiere. Belletiere argues that this evidence without more cannot support a section 3B1.1(a) upward adjustment for "leading" or "organizing" five or more participants in a criminal activity.

Again, because the district court made no independent factual findings but instead adopted the reasons set forth by the probation officer in the Presentence Report, we must view the report as containing the only findings of fact that support the court's imposition of an upward adjustment pursuant to section 3B1.1(a). Since we are reviewing the report as evidence relied on by the district court in applying section 3B1.1, we may only reverse if the district court's decision was clearly erroneous. *Phillips*, at 1191. A finding is clearly erroneous if, after reviewing all of the evidence, we are left with a firm conviction that a mistake has been made. *Id.* at 1191 (citing *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 850 (3d Cir.1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985)).

Section 3B1.1 requires that the defendant be an "organizer or leader of *criminal activity that involved five or more participants, or was otherwise extensive.*" U.S.S.G. § 3B1.1(a) (emphasis added). In defining "participant," the commentary states "[a] 'participant' is a person who is criminally responsible for the commission of *the* offense, but need not have been convicted." U.S.S.G. § 3B1.1 comment. (n.1) (emphasis added). The commentary also makes it clear that "criminal activity" denotes a group or organization of people involved in carrying out one or more crimes together:

In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

*Id.* comment. (n.2). Additionally, the background commentary states "[t]his section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1 comment. (backg'd). As we recognized in *Phillips:*

Clearly, § 3B1.1 is intended to apply to criminal activity engaged in by more than one participant. Moreover, because § 3B1.1 does not apply when a defendant engages in criminal activity that is executed without the aid of others, for § 3B1.1 to apply, "the defendant must have exercised some degree of control over others involved in the commission of the offense."

*Phillips*, at 1191 (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir.1990)); *see also United States v. Fuentes*, 954 F.2d 151, 154 (3d Cir.1992) (holding that under section 3B1.1 "a defendant's offense level may not be increased ... in the absence of evidence that he or she managed or supervised someone else."), *cert. denied*, —— U.S. ——, 112 S.Ct. 2950, 119 L.Ed.2d 573 (U.S.1992).

Thus, section 3B1.1 applies to situations where an individual is a leader or organizer of individuals who participate *together* in committing one or more criminal acts. "[T]he adjustments authorized for role in the offense are directed to the relative culpability of participants in *group* conduct." *United States v. Bierley*, 922 F.2d 1061, 1065 (3d Cir.1990) (emphasis added). The participants need not each be criminally culpable of the charged offense, but must be criminally culpable of "the underlying activities ... that directly brought about the more limited sphere of the elements of the specific charged offense." *United*

*States v. Inigo*, 925 F.2d 641, 659 (3d Cir. 1991) (quoting *United States v. Manthei*, 913 F.2d 1130, 1136 (5th Cir.1990)). In other words, the participants do "not have to be guilty [of the charged offense] in connection with [the defendant's] scheme so long as their own criminal conduct made it possible." *Id.*

Where an individual is convicted of a series of solitary, non-related crimes, such as a series of drug sales by one drug seller to various buyers, and there is no "organization" or "scheme" between the drug seller and buyers, or between the buyers themselves, that the defendant could be said to have "led" or "organized," section 3B1.1 cannot apply.[7] The United States Court of Appeals for the Tenth Circuit has reached the same conclusion with respect to simple buyer/seller relationships:

> We have held that pursuant to § 3B1.1(c), "the defendant's supervisory or managerial status is not sufficiently proved by indicating a mere buyer/seller relationship between the defendant and the alleged group or network participants." *A fortiori* a defendant's status as an organizer or leader is not sufficiently proven merely by showing that defendant purchased drugs from a supplier or sold drugs to a customer for his personal use. Before a supplier or customer may be deemed to have been a "controlled" participant under § 3B1.1(a), the government must prove at least an interdependence between the defendant and the supplier or customer that would support an inference that the supplier or customer for personal use is answerable to the defendant. Merely because a crime is extensive (several purchasers and sales of drugs) does not automatically mean that a defendant orga-

nizes or leads his suppliers or his customers who buy for personal use.

*United States v. Reid*, 911 F.2d 1456, 1465 (10th Cir.1990) (citation and footnote omitted), *cert. denied*, — U.S. —, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). The Tenth Circuit applied this reasoning in *United States v. Moore*, 919 F.2d 1471 (10th Cir. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 2812, 115 L.Ed.2d 985 (1991), in holding that the trial court erred in counting two customers as "participants" led or organized by the defendant:

> Our review of the record here found no evidence that Moore exercised any authority, direction or control over his two customers' resale of the cocaine purchased from him. Instead, the evidence indicated that Moore was only a source for cocaine for his customers, who chose to personally use the drug or to resell it, without interference from Moore. The trial court thus erred in including these two customers as among those led by Moore.

*Moore*, 919 F.2d at 1477–78. At least one other court has similarly interpreted section 3B1.1:

> Section 3B1.1(a) ... requires not only that the operation be extensive or have five or more participants, but also that the defendant be an organizer or leader. The record does not support the proposition that [the defendant] organized or led anyone. One who commits a series of solitary crimes does not become an organizer or leader because his crime is extensive; one ordinarily does not, simply by virtue of selling drugs, lead or organize those to whom he sells.

*United States v. Weidner*, 703 F.Supp. 1350, 1354 (N.D.Ind.1988), *aff'd mem.*, 885 F.2d 873 (7th Cir.1989); *see also* U.S.S.G. § 3B1.1 comment. (n.3).[8]

---

**7.** At oral argument the government conceded that section 3B1.1 does not apply to a mere buyer-seller relationship, but argued that the evidence in this case demonstrates that Belletiere was the leader of a cocaine distribution "pyramid." Tr. of Oral Arg. at 30.

**8.** The commentary to section 3B1.1 sets out factors useful to a court to distinguish between whether an individual acted as a "leader" or "organizer," or rather as a "supervisor" or "man-

ager," for purposes of section 3B1.1. They include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

We have reviewed the evidence and believe that the district court clearly erred in adding a four level adjustment to Belletiere's sentence pursuant to section 3B1.1(a). The Presentence Report adopted by the district court identified Belletiere as "the leader of an extensive cocaine trafficking operation that involved five or more participants," specifically Charles Craig, Neal DeAngelo, Paul DeAngelo, Neal Forte, David Mishinski and James Yurkovic, and stated that Belletiere "exercised decision making authority, established prices, and supplied multi-kilograms of cocaine for redistribution." Supp.App. at 357.[9] The evidence, however, clearly shows that Belletiere made a series of unrelated drug sales to these people that constituted separate offenses for purposes of section 3B1.1(a). None of the buyers were "led" or "organized" by, nor "answerable" to, the defendant.

Specifically, the evidence shows that Belletiere regularly sold cocaine to Charles Craig (Craig), who then personally used the drugs and also sold it to others without interference or direction from Belletiere. Belletiere sent the cocaine to Craig at Craig's place of business in Federal Express packages, and Craig then sent cash payments to Belletiere, also in Federal Express packages. At one point, Belletiere told Craig to purchase cocaine from a James Gallagher in New York City but to send payment for the drugs directly to Belletiere, because Gallagher owed Belletiere money.[10] After receiving cocaine from Gallagher on two occasions, Craig informed Belletiere that he would no longer buy cocaine from Gallagher because Gallagher was adding "cutter" to the cocaine. Craig then resumed his drug purchases from Belletiere, and continued to use and sell the

drugs to others without interference or direction from Belletiere.

One of Craig's customers was Dave Mishinski (Mishinski). In 1986, Craig asked Mishinski to receive some of Belletiere's Federal Express packages for Craig at Mishinski's place of business. Mishinski agreed to do so as a favor to Craig. He received several Federal Express packages for Craig, but then told Craig he did not want to receive any more packages. Belletiere at one point offered to send Mishinski his own packages, but Mishinski declined.

James Yurkovic (Yurkovic), Craig's brother-in-law, was also one of Craig's customers. Yurkovic worked with Craig and knew that Craig received drugs from Belletiere in Federal Express envelopes. Yurkovic decided to cut Craig out as a middleman, called Belletiere and asked Belletiere to send him drugs directly. Yurkovic purchased drugs from Belletiere several times until Craig found out and warned Yurkovic that if he continued to buy directly from Belletiere, Craig would no longer supply Yurkovic with drugs. Yurkovic then decided not to buy any more drugs from Belletiere, and resumed buying drugs from Craig. Craig also informed Belletiere that he was unhappy about Belletiere's direct dealings with Yurkovic because Craig "felt that [Belletiere] was in there trying to take over my customers." Appellant's Supplemental Appendix (Supp.App. II) at 57.

During the summer of 1986 Craig took a one-week trip to Miami to meet with Belletiere. While there, the two discussed prices and quantities and also used drugs with some of Belletiere's friends. Craig told Belletiere that the cocaine was too expensive, and Belletiere agreed to decrease the price of the cocaine. After Craig returned to Hazleton, Craig purchased cocaine from Belletiere over time in

---

U.S.S.G. § 3B1.1 comment. (n.3); *see Phillips,* at 1191; *United States v. Ortiz,* 878 F.2d 125, 127 (3d Cir.1989).

**9.** Because the Presentence Report identified Belletiere as the leader or organizer of five or more participants and not of an "otherwise extensive" criminal activity, and because the district court adopted the Report without making any other factual findings, we need not and do not consid-

er whether Belletiere was the leader or organizer of an "otherwise extensive" criminal activity.

**10.** The government did not introduce any other evidence concerning Belletiere's relationship with Gallagher, and the probation officer did not include James Gallagher as one of the "other participants" for purposes of section 3B1.1(a) in the Presentencing Report.

larger and larger quantities, again complained about Belletiere's prices and told him "there ... was just too much competition in the Hazleton area to sell it that expensive—to pick it up that expensive, I need[ ] a better price." *Id.* at 55. Belletiere again agreed to decrease his prices. Craig stopped purchasing drugs from Belletiere in 1988.

This evidence shows only that Belletiere made a series of drug sales to Craig, and also sold drugs separately to Yurkovic on several occasions without Craig's knowledge. Belletiere had no control over Craig's use or resale of the cocaine and, in fact, most of the terms of the sales were dictated by Craig, not Belletiere. Although Craig testified that he "entered into distribution of cocaine with Belletiere," *id.* at 34, Belletiere exercised no control over Craig's resale or distribution network and only acted as a supplier to Craig. If anything, Belletiere and Craig competed for the same customers.

The evidence also shows that on one occasion Neal Forte (Forte), a large-scale drug dealer in the Hazleton area, purchased drugs from Belletiere in Miami for resale in Hazleton. The evidence shows that one of Forte's customers, Paul DeAngelo, along with his brother, Neil DeAngelo, met with Belletiere in Allentown, Pennsylvania to discuss the deal and then flew down to Miami with Forte to purchase the cocaine from Belletiere. At trial, Neil DeAngelo testified that he was the person who suggested and set up the trip to Florida and made the arrangements with Belletiere. Forte never met or spoke with Belletiere. After bringing the cocaine back to Hazleton, Forte paid Neil DeAngelo $500.00 for arranging the deal and sold the cocaine. Neil DeAngelo recalled that he may have spoken to Belletiere several more times to arrange another deal, but that nothing ever came of it.

Neil DeAngelo testified that Belletiere made the arrangements for the hotel meeting in Allentown, and told DeAngelo to use pay phones and speak in code language when contacting Belletiere. Belletiere also told DeAngelo which motel to use when they flew in to Miami. Other than the logistics of their communications and the drug sale, Belletiere exerted no influence over Forte or the DeAngelos and no control over the resale of the cocaine or any further purchases.

This evidence demonstrates that Belletiere on one occasion sold drugs to Forte in a deal also involving the DeAngelo brothers. It does not show that Belletiere exerted leadership, control or influence over Forte or the DeAngelo brothers on this or any other occasion, or that these people were "answerable" to Belletiere in any way. The offense was a simply buyer/seller drug transaction.

The evidence also fails to show any connection between the Forte deal and the drug sales to Craig and Yurkovic. It demonstrates that Belletiere made individual sales of drugs to Craig (which at times involved Mishinski) and Yurkovic, and one sale to Forte (which involved the DeAngelo brothers). Accordingly, it was improper for the district court to treat these two groups of individuals as "participants" in the same criminal activity or offense under section 3B1.1.

We therefore hold that the district court clearly erred in finding that Belletiere was an organizer of leader of a criminal activity that involved five or more participants pursuant to U.S.S.G. § 3B1.1(a).

## V.

Finally, Belletiere argues that the district court erred in calculating the total quantity of cocaine involved in this case, and therefore applied the wrong base offense level from the Drug Quantity Table at U.S.S.G. § 2D1.1(c). We have carefully reviewed the record on this point and conclude the district court did not clearly err in calculating the total quantity of drugs involved as 5.9 kilograms and applying a base offense level of 32. Therefore, we reject Belletiere's argument that the district court used an incorrect base level for his offense.

## VI.

In summary, we hold that the district court correctly applied a base offense level of 32 but erred in adjusting Belletiere's sentence upward by 4 levels pursuant to U.S.S.G. § 3B1.1 and by two levels pursuant to U.S.S.G. § 3C1.1. Accordingly, we will vacate the district court's judgment and order of sentence and remand with instructions for the district court to resentence Belletiere at an offense level of 32 consistent with the Sentencing Guidelines.

ALITO, Circuit Judge, concurring:

I concur in the court's decision except insofar as it holds that an adjustment under U.S.S.G. § 3C1.1 could not be based on the defendant's alleged false statement to the probation officer that he did not use drugs.

U.S.S.G. § 3C1.1 requires a two-level increase in offense level if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede administration of justice during the investigation, prosecution, or sentencing of the instant offense." As an example of conduct falling within this provision, Application Note 3(h) lists "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." Thus, the defendant's alleged conduct in this case appears to fall squarely within U.S.S.G. § 3C1.1.

The court seems to suggest that U.S.S.G. § 3C1.1 does not apply here because the defendant's false statement did not relate to the "instant offense." I agree that the false statement did not occur during and could not have affected the investigation or prosecution of the instant offense, but it did occur during and, if believed, could have affected the sentencing of the instant offense. While substance abuse is generally not an appropriate reason for a downward departure at sentencing (U.S.S.G. § 5H1.4; see also United States v. Pharr, 916 F.2d 129, 133 (3d Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991)), the Guidelines highly recommend that a defendant who is a drug abuser be sentenced to a period of supervised release or probation with a requirement that he participate in an appropriate substance abuse program. Id. Thus, every presentence report, including Belletiere's, contains a section on drug dependence and alcohol abuse. Accordingly, I think that Belletiere's alleged false statement about drug use could well have constituted an attempt to impede proper sentencing under U.S.S.G. § 3C1.1.

The court also holds that the false statement "was not material to the probation officer's investigation in this particular case." Maj. at 968. The court reasons that the probation officer had the ability to verify the defendant's statement by conducting drug tests and in fact did so. I respectfully disagree with this analysis.

A "material" statement is defined in U.S.S.G. § 3C1.1, Application Note 5, as a statement that "*if believed*, would tend to influence or affect the issue under determination" (emphasis added). Thus, it is not necessary that the statement be believed or even believable. This definition is the same as that applicable in prosecutions for false statements. In such cases, a false statement is material if it "has a tendency to influence, impede, or hamper" the factfinder or to "cloud" the facts. *United States v. Lardieri*, 497 F.2d 317, 319 (3d Cir.1974). It is not necessary to show that the false statement actually influenced, impeded, or hampered the factfinder. *See, e.g., United States v. Brown*, 666 F.2d 1196, 1200 (8th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *United States v. Giarratano*, 622 F.2d 153, 156 (5th Cir.1980). Moreover, it is well settled that a false statement may be material even if the investigating body already knows the truth or can readily learn the truth from other sources. *See, e.g., United States v. Moeckly*, 769 F.2d 453, 465 (9th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 311 (1986), 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986); *United States v. Ponticelli*, 622 F.2d 985, 989 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980); *United States v. Richardson*, 596 F.2d 157, 165 (6th Cir.1979).

I therefore believe that an enhancement under U.S.S.G. § 3C1.1 may be proper when a defendant lies about drug use to a probation officer. In the present appeal, however, I do not believe that we can affirm the enhancement on this ground because the defendant's attorney may not have had the opportunity to raise all of his factual or other objections to the enhancement before the trial judge cut him off by granting the enhancement on the other ground discussed in the court's opinion. Thus, I would direct the district court to entertain any such objections on remand.