**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1754
_____

UNITED STATES OF AMERICA

v.

KENNETH R. DOUGLAS,
Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA
(D.C. No. 2-09-cr-00105-009)
District Judge: Hon. David S. Cercone

_____

Argued March 23, 2016[*]
_____

Before: GREENAWAY, JR., VANASKIE, and SHWARTZ,
Circuit Judges.

_____

[*] One sentencing issue was argued en banc on October
18, 2017, and will be addressed in a separate opinion.

(Filed: March 15, 2018)

Arnold P. Bernard, Jr., Esq. [ARGUED]
437 Grant Street
Suite 407
Frick Building
Pittsburgh, PA 15219
      *Counsel for Appellant*


Michael L. Ivory, Esq. [ARGUED]
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
      *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

SHWARTZ, <u>Circuit Judge</u>.

Kenneth Douglas appeals his sentence, arguing that the District Court incorrectly held him responsible for trafficking more than 450 kilograms of cocaine, erroneously applied sentencing enhancements for abuse of a position of trust under U.S.S.G. § 3B1.3 and obstruction of justice under U.S.S.G. § 3C1.1, and failed to appropriately consider the disparity between his sentence and those imposed on his co-conspirators. For the reasons discussed below, we will affirm

the sentence with respect to the drug calculation and reverse the obstruction of justice enhancement.[1]

I

Douglas participated in a conspiracy to distribute cocaine. The conspiracy began years before he joined it, when Tywan Staples, who lived in the San Francisco area, began supplying marijuana to his cousin Robert Russell Spence in Pittsburgh. Staples and Spence went from selling small amounts of marijuana to shipping four to six kilograms of cocaine across the country several times a month. After law enforcement intercepted several packages containing money and drugs, the conspirators began using couriers to carry drugs and money on commercial flights. By 2008, six different couriers were transporting cocaine out of the Oakland, California airport. After two of the couriers were arrested, the conspirators began using San Francisco International Airport ("SFIA") instead.

---

[1] The Panel filed an opinion on February 22, 2017, that affirmed the drug calculation, reversed the imposition of the obstruction of justice enhancement, and affirmed the abuse of position of trust enhancement. The Court granted the petition to rehear the application of the abuse of position of trust enhancement, and upon rehearing en banc, the Court en banc determined that the enhancement does not apply. The en banc opinion is filed contemporaneously with this opinion. United States v. Douglas, No. 15-1754, --- F.3d --- (3d Cir. _____) (en banc). This Panel opinion essentially reinstates the original Panel opinion except for the issue addressed by the Court en banc.

Staples, who worked at the "maintenance base" at SFIA, knew Douglas, who was an airline mechanic for United Airlines. Douglas had an Airport Operation Authority ("AOA") badge that enabled him to enter the airport terminal without being screened at a Transportation Security Administration ("TSA") checkpoint.[2] Unlike Douglas, Staples did not have the ability to enter the terminal without inspection. For that reason, when Douglas asked Staples if he had "any way [Douglas] could make some extra money," Staples invited him to join the conspiracy. Douglas accepted.

Staples and Douglas facilitated the movement of cocaine in a simple way. Staples would deliver the cocaine to Douglas packed in a bag with clothing. Douglas would then smuggle the bag into the terminal and either transfer it to a courier once inside the secured area of the terminal, or board the plane as a passenger with the drugs.

Staples testified that Douglas assisted with the movement of the cocaine "40 to 50 times," transporting ten to thirteen kilograms of cocaine on each occasion. App. 102. Douglas transported drugs himself on seventeen occasions. Unlike the couriers, he was not required to bring cash back to California, so as to avoid any risk of being caught, which would, in turn, shut down the conspiracy's San Francisco

---

[2] Douglas's supervisor described the way Douglas would access the terminal. To enter the terminal through a secured employee entrance, an employee has to use his AOA badge as well as place his hand on a biometric scanner. However, to leave the terminal, only the AOA badge is required. On a random basis, the TSA would search employees entering the terminal.

distribution activities. Staples testified that Douglas was paid $5,000 each time that he smuggled cocaine into the airport, and another $5,000 each time he delivered a shipment himself.

Using airline records, the Government identified forty-six specific flights departing from SFIA between January and November of 2009 that were associated with the conspiracy, including seventeen flights on which Douglas personally transported drugs, sometimes using his employee benefit tickets. These flights included very short round trips that were inconsistent with personal travel, and corresponded to phone calls among the conspirators, the use of pre-paid credit cards, and the timing of deposits into Douglas's bank account.

Following an investigation, a grand jury returned an indictment against Douglas and twenty-one co-defendants. Douglas was charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h). Douglas was arrested and released on bail, subject to several conditions, including travel restrictions and a requirement that he appear for court proceedings. While Douglas was on bail, the Probation Office discovered that he had booked a flight to Jamaica without permission. At his bail revocation hearing, Douglas claimed he had mistakenly booked a flight for himself while booking a flight for his wife. The District Court did not revoke his bail, but modified his conditions of release to require him to call probation daily to verify his whereabouts.

Douglas's trial was scheduled to begin on January 8, 2014. He failed to appear for the first day of trial. The next

day, he filed a motion for a continuance claiming that he "was receiving medical attention on January 8, 2014 and was unable [to be] in court for that reason." Supp. App. 47. In connection with the motion, Douglas submitted documents showing that he was admitted to the emergency room around 2:00 a.m. on January 8, complaining of chest pain. The records show that he was treated with aspirin and intravenous insulin, transported via ambulance to an urgent care facility, and had a series of tests in both medical facilities. Douglas's EKG revealed possible heart blockage, and his blood tests indicated he had an abnormal white blood cell count, as well as an elevated enzyme level that can be indicative of a heart attack. He received instructions for taking eight over-the-counter and prescription medications, in addition to the medication he was already taking for diabetes. Douglas was also instructed to schedule follow-up testing and appointments with several specialists. Douglas was also given a doctor's note bearing the time 4:12 p.m. asking that he be excused from court on January 8.

Based on this evidence, the Government argued that it was "possible that [Douglas] went there [at] 2:00 in the morning faking this illness, so he wouldn't have to be here today. It is also possible that that was a legitimate illness. I don't think that anything in the records tells us one way or the other." App. 388. Despite the hospital records, the District Court stated that "[t]here's no solid evidence, at least presented, that he was suffering from a medical condition that warranted him not to appear. It's really sort of ambiguous." App. 390–91. Expressing concern that Douglas would not appear for jury selection the following Monday, the District Court revoked his bail.

On January 13, 2014, a jury was selected for the joint trial of Douglas and a codefendant, but the next day, Douglas's attorney withdrew, Douglas's case was severed, and his trial was adjourned.  His bail was reinstated but modified to require home detention and electronic monitoring.

Douglas obtained new counsel and later waived his right to a jury trial.  At the bench trial, the Government offered testimony from several coconspirators, law enforcement officers, and a United Airlines supervisor.  The Government also presented documents corroborating their testimony.  Following the trial, the District Court convicted Douglas of both charges.

Before sentencing, the Probation Office submitted a pre-sentence investigation report ("PSR") recommending that Douglas be held responsible for 450 kilograms of cocaine, resulting in a base offense level of 38.  Applying the grouping rules, the PSR recommended a two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because Douglas had been convicted of conspiracy to engage in money laundering.  The PSR also recommended a two-level enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3, and a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, for a total offense level of 44, which is treated as a 43, the maximum offense level under the Guidelines, which corresponds to a Guidelines sentence of life imprisonment.  Douglas objected to the drug quantity as well as to the upward adjustments for obstruction of justice and abuse of a position of trust.

At sentencing, the District Court overruled Douglas's objections, citing Staples's testimony that Douglas smuggled

between 10 and 13 kilograms of cocaine between 40 and 50 times, and concluding based on the number of trips that "there is ample evidence to show that [he] was responsible for more than 450 kilograms of cocaine." Supp. App. 236, 393, 403 (noting that his involvement was not an "anomaly"), 411 (observing that the evidence against him was "overwhelming").

The District Court also noted the presence of "aggravating factors," including that Douglas "use[d] [his] position of trust with the airlines and, more specifically, [his] level of security clearance to aid [him] in being part of th[e] conspiracy to distribute controlled substances and the amount of drugs that . . . [was] transported with [his] assistance was enormous." App. 411. As to the obstruction of justice enhancement, the District Court relied upon Douglas's failure to appear on the first day of trial, but made no findings beyond those it made in its tentative findings, in which it deemed the objection to the enhancement to be "without merit." Supp. App. 237-47.

After determining the total offense level to be 43, the District Court noted that it had "gone through all of the 3553 factors[,] [ ] looked at them all to determine a sentence that [wa]s sufficient but not greater than necessary," decided to vary downward from the Guidelines sentence of life imprisonment, App. 411-12, and imposed a sentence of 240 months' imprisonment for each count, to be served concurrently, followed by five years of supervised release. Douglas appeals.

8

II[3]

We review sentences for both procedural and substantive reasonableness.  United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).  At the first stage, in which we review for procedural reasonableness, we seek to

> ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

Id. (alteration omitted) (quoting Gall v. United States, 552 U.S. 38, 50-51 (2007)).  If the district court's sentencing procedure

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).  We exercise plenary review over the construction of the Sentencing Guidelines themselves.  United States v. Greene, 212 F.3d 758, 760 (3d Cir. 2000).  We review the factual determinations underlying a sentence for clear error.  "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc) (alterations and citations omitted).

"passes muster, we then, at stage two, consider its substantive reasonableness," based on the totality of the circumstances. Tomko, 562 F.3d at 567 (internal quotation marks omitted); see also Gall, 552 U.S. at 51. Absent significant procedural error, "we will affirm [the sentence as substantively reasonable] unless no reasonable sentencing court would have imposed the same sentence on th[e] particular defendant for the reasons the district court provided." Tomko, 562 F.3d at 568.

We will first review Douglas's challenge to the drug quantity calculation and then address his argument concerning the Guidelines enhancement.

A

At sentencing, "the government bears the burden of [proving drug quantity] by a preponderance of the evidence." United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993). While "some degree of estimation must be permitted," United States v. Collado, 975 F.2d 985, 998 (3d Cir. 1992), the district court must satisfy itself that the evidentiary basis for its estimate has sufficient indicia of reliability. See United States v. Miele, 989 F.2d 659 (3d Cir. 1993) (drug quantity estimation based solely on grand jury testimony of single drug-addicted witness who had contradicted himself was not sufficiently reliable). "'Indicia of reliability may come from . . . corroboration by or consistency with other evidence . . . .'" United States v. Freeman, 763 F.3d 322, 337 (3d Cir. 2014) (quoting United States v. Smith, 674 F.3d 722, 732 (7th Cir. 2012)).

The evidence supports the District Court's factual determination that Douglas was responsible for more than 450

kilograms of cocaine. Staples testified that Douglas smuggled "[10] or 13 kilograms" of cocaine through SFIA "40 to 50 times," App. 102, which totals between 400 and 650 kilograms of cocaine. Staples knew the amount of drugs because he provided Douglas with the cocaine, and nothing in the record suggests that his perception or memory was impaired in any way or that he provided inconsistent information on this topic. Cf. Miele, 989 F.2d at 666.

Furthermore, the Government corroborated Staples's testimony with flight records, telephone toll records, and bank deposits. It identified forty-six flights taken out of SFIA by various drug couriers, including Douglas, all of which depended on Douglas to smuggle drugs past security into the terminal. Even if each flight involved only the minimum 10 kilograms of cocaine, this would justify an estimate of over 450 kilograms. The fact that the number of flights was established through circumstantial evidence does not mean that reliance on it was error. See, e.g., United States v. Jones, 531 F.3d 163, 175 (2d Cir. 2008) ("The quantity of drugs attributable to a defendant is a question of fact. As such, if the evidence— direct or circumstantial—supports a district court's preponderance determination as to drug quantity, we must sustain that finding.").

Furthermore, the fact that Douglas used employee benefit tickets for some of the trips does not undermine the conclusion that the trips were taken for the conspiracy. Staples testified that Douglas sometimes used his benefits for these flights, despite the fact that doing so was riskier because he might be required to wait longer to board a flight.

Douglas's argument that cash deposits into his bank account could have come from gambling is also unavailing. The regularity of the deposits and the correspondence between the dates of the deposits and the suspicious flights provides a reasonable basis to infer that the flights were related to the conspiracy.[4]

In sum, Staples's testimony and the documentary evidence provide ample support for the determination that Douglas was responsible for more than 450 kilograms of cocaine, and the District Court did not err in so finding.

B

We next examine the application of the § 3C1.1 enhancement for obstruction of justice. Section 3C1.1 provides a two-level increase in the offense level where "the defendant willfully obstructed or impeded . . . the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction, and [ ] the obstructive conduct related to . . . the defendant's offense of conviction . .

---

[4] Douglas attempts to argue in the alternative that the District Court should have calculated the total drug quantity based only on the seventeen flights he personally took because the Government presented more specific evidence concerning its identification of these flights. While these flights were substantiated in more detail at trial, Staples's testimony, combined with the flight records for the other drug couriers and the deposits into Douglas's bank account, provide a sufficient basis for the District Court to conclude that Douglas was involved in smuggling drugs approximately forty-six, rather than seventeen, times.

12

. . ." U.S.S.G. § 3C1.1. "[W]illfully failing to appear, as ordered, for a judicial proceeding" is covered conduct. <u>Id.</u> § 3C1.1 cmt. n.4(E). "Willfully" in this context means "deliberately or intentionally; in other words, not negligently, inadvertently, or accidentally." <u>United States v. Jenkins</u>, 275 F.3d 283, 287 (3d Cir. 2001) (internal quotation marks omitted). The word "willful . . . when used in a criminal statute . . . generally means an act done with a bad purpose." <u>United States v. Belletiere</u>, 971 F.2d 961, 965 (3d Cir. 1992) (internal quotation marks omitted). The government bears the burden of proving that the defendant "willfully obstructed or impeded . . . the administration of justice" by a preponderance of the evidence. <u>Id.</u>

The District Court adopted the PSR's recommendation to impose the obstruction of justice enhancement based on Douglas's "fail[ure] to appear for trial on January 8, 2014." PSR ¶ 27. During the hearing addressing his failure to appear, the District Court was provided with medical records and informed that Douglas had been in the hospital. The District Court considered the records and arguments and said that "[t]here's no solid evidence, at least presented, that he was suffering from a medical condition that warranted him not to appear. It's really sort of ambiguous." App. 390-91. As a result, the District Court concluded that there was a "substantial risk" that Douglas would not appear at trial and thereby disrupt the administration of justice. App. 391. In connection with sentencing, the District Court relied on these facts to impose the § 3C1.1 enhancement, making no additional

factual findings on the subject, and declared the objection to the enhancement to be "without merit."[5] Supp. App. 236.

Douglas asserts that the District Court erred in imposing the enhancement. He points out that he provided a medical explanation for his absence from trial, notes that the District Court made no findings that he willfully failed to appear for trial, and argues that the subsequent reinstatement of his bail and the granting of travel requests shows that the District Court "did not find that the Appellant's failure to appear on his jury selection date was willful." Appellant's Br. at 35.

While there is no question that Douglas was aware of the date of trial and he intentionally did not appear in court, the record does not show that he willfully failed to appear. Douglas provided medical documentation that explained his absence. These records show that he awoke the morning of

---

[5] At the sentencing hearing, the District Court requested clarification for the basis on which the Government sought the enhancement, asking that it "[b]e more specific with regard to obstruction" and whether its basis was "[f]ailure to appear for court." App. 407. The Government said it was but also listed several allegedly false statements Douglas made that caused law enforcement to waste investigatory effort. Douglas's attorney then stated that he had been under the impression the obstruction of justice enhancement "was predicated on failure to appear for trial." App. 408. The Government repeated that there were multiple reasons but that "[b]oth the probation office and [the Court] already ruled on them." App. 408-09. The District Court then stated "I agree. That matter has already been thoroughly covered. The Court has ruled on it." App. 409.

trial with chest pain and went to the emergency room at 2:00 a.m., underwent tests showing a possible heart blockage, abnormal white blood cell count, and elevated heart enzyme levels, and was treated with insulin and aspirin. His complaints were taken seriously, as reflected by the fact that he was transported by ambulance to the hospital's urgent care facility for tests. Most significantly, the documentation included a page entitled "verification of treatment" signed by a medical doctor at 4:12 p.m. on January 8, 2014, which stated that Douglas received care and requested that the court "[p]lease excuse Mr. Douglas' absence from court today." Given this documentation, we are unable to determine why the District Court viewed his medical excuse skeptically or described the documentation as "ambiguous." App. 391.

Moreover, the Government bears the burden of proof and offered no evidence to show Douglas's conduct was willful, in the sense that Douglas deliberately schemed not to appear in court by feigning illness. See United States v. Batista, 483 F.3d 193, 195-97 (3d Cir. 2007) (five mental health evaluations showed defendant was feigning a mental illness to avoid being found competent). In fact, during the bail review hearing the Government stated it was "possible that he went to the [hospital] faking this illness, so he would not have to be here. It is also possible that that was a legitimate illness. I don't think that anything in the records tell us one way or the other." App. 388. The Government therefore viewed the record as being in equipoise. This is not proof by a preponderance of the evidence that Douglas willfully failed to appear. Absent such proof from the Government showing willfulness, and in light of the medical documentation presented indicating a lack of willfulness, the application of a

15

§ 3C1.1 enhancement was improper.[6]

By improperly applying the obstruction of justice enhancement, the District Court did not accurately calculate Douglas's Guidelines range.  See United States v. Wright, 642 F.3d 148, 152 (3d Cir. 2011) (noting that the application of sentence enhancements is used in calculating a defendant's Guidelines range).  Failure to make a "correct computation of

_____

[6] Because we will remand for resentencing due to the erroneous application of the enhancement (and the Court en banc remands because the enhancement under § 3B1.3 does not apply), we need not address the substantive reasonableness of the sentence.  United States v. Merced, 603 F.3d 203, 214 (3d Cir. 2010).  We do note, however, that with respect to substantive reasonableness, Douglas argued only that the District Court did not consider § 3553(a)(6)'s mandate that courts avoid unwarranted sentencing disparities among codefendants.  He asserts that his 240-month sentence is excessive in comparison with his coconspirators who he claims held managerial roles and participated in the conspiracy for a longer time.  Putting aside the fact that Douglas was a lynchpin of the conspiracy's San Francisco activities and that he played a more significant role than other conspirators, and thus he does not share "exactly parallel[ ]" circumstances with them, United States v. Iglesias, 535 F.3d 150, 161 n.7 (3d Cir. 2008), his parity complaint would not entitle him to any relief.  "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case."  United States v. Parker, 462 F.3d 273, 277 (3d Cir. 2006).  As a result, Douglas "cannot rely upon § 3553(a)(6) to seek a reduced sentence" based on alleged disparity between his sentence and those imposed on his co-defendants.  Id.

the Guidelines range" constitutes procedural error. Id. (citing United States v. Langford, 516 F.3d 205, 214 (3d Cir. 2008)).

Here, Douglas's total offense level with the enhancement was 43, which corresponds to life imprisonment. Without the § 3C1.1 enhancement, Douglas's total offense level corresponds to 360 months to life imprisonment.[7] Ultimately, the District Court applied a downward variance and imposed a sentence of 240 months. While the District Court may still have imposed a sentence of 240 months absent the § 3C1.1 enhancement, we cannot be sure. See, e.g., Vazquez-Lebron, 582 F.3d at 446 ("[W]e cannot be sure that the district court would have imposed the same sentence if not for the error."); Langford, 516 F.3d at 219 ("[This] is not that rare case where we can be sure that an erroneous Guidelines calculation did not affect the sentencing process and the sentence ultimately imposed."); see also Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016) ("When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error."). We will therefore reverse the application of the § 3C1.1 enhancement and remand for resentencing.

## III

For the foregoing reasons, we will affirm the District Court's conclusion regarding drug quantity, reverse the

---

[7] Without the § 3B1.3 enhancement, Douglas's total offense level corresponds to 324 to 405 months' imprisonment.

enhancement for obstruction of justice, and remand for resentencing.