UNITED STATES of America

v.

**Renato P. MARIANI, Michael Serafini, Leo Del Serra**

Nos. 3:CR–97–225, 3:CR–98–307.

United States District Court, M.D. Pennsylvania.

May 24, 2002.

Renato P. Mariani, Lewisburg, PA, pro se.

Eli C. Schulman, Floyd Abrams, Susan Buckley, James E. Rosenfeld, Cahill, Gordon & Reindel, New York City, Mark E. Cedrone, Carroll & Cedrone, Philadelphia, PA, Thomas Colas Carroll, Carroll & Cedrone, Philadelphia, PA, for Renato P. Mariani.

Gregory T. Magarity, Philadelphia, PA, for Michael L. Serafini.

Michael L. Serafini, Clarks Summit, PA, pro se.

Leo R. Del Serra, West Pittston, PA, pro se.

Elizabeth Read Carruthers, Welsh & Recker, Philadelphia, PA, Robert E. Welsh, Jr., Catherine M. Recker, Welsh & Recker, P.C., Philadelphia, PA, for Leo R. Del Serra.

Joseph D. Mancano, Britt, Hankins, Schaible & Moughan, Philadelphia, PA, for Robert Giglio.

Robert Giglio, Old Forge, PA, pro se.

## OPINION

VANASKIE, Chief Judge.

This Opinion is issued in support of the Order entered in these matters on May 16, 2002. The Order summarily set forth the findings underlying the determination of the sentencing guideline range under the United States Sentencing Guidelines

("USSG") in these matters for each of the remaining defendants.

## I. BACKGROUND

On December 4, 2000, defendants Renato P. Mariani, Michael Serafini, and Leo Del Serra entered pleas of guilty to the first counts of two multi-count indictments returned against them, as well as others, and docketed to 3:CR–97–225 and 3:CR–98–307. Count One of the indictment docketed to 3:CR–97–225 charged the above-named defendants, along with Alan W. Stephens, with conspiring to have individuals associated in some way with the Empire Sanitary Landfill, Inc. ("Empire") make individual contributions to certain candidates for federal political offices, and to then have those individuals reimbursed for their contributions with funds that originated from Empire.[1] The Federal Election Campaign Act generally prohibits corporations from making contributions to political committees of candidates for federal elective office, see 2 U.S.C. § 441b, and generally prohibits reimbursement of individuals who have made contributions. See 2 U.S.C. § 441f. The indictment charged that $129,000 in contributions to various political candidates for federal elective office had been funneled through conduits, covering the period October, 1994 through June, 1995. The conspiracy count to which Mariani, Serafini and Del Serra pled guilty charged four wrongful objectives:

(1) to defraud the United States by impairing, impeding, defeating and obstructing the lawful functions and duties of the FEC in violation of 18 U.S.C. § 371;

(2) to knowingly and willfully cause others to make false statements to the FEC in violation of 18 U.S.C. § 1001;

(3) to knowingly and willfully make, consent to, and cause to be made, corporate contributions to federal candidates and their political committees in violation of 2 U.S.C. § 441b; and

(4) to knowingly and willfully make and cause to be made contributions to federal candidates and their political committees in the name of third persons ("conduits") in violation of 2 U.S.C. § 441f.

Indictment at 3:CR–97–225, ¶ 18.

Count 1 of the indictment docketed to 3:CR–98–307 charged Mariani, Serafini, Del Serra and Stephens with having conspired to send to the Pennsylvania Department of Environmental Protection (DEP) and various local governments reports that deliberately omitted waste tonnage accepted at Empire that exceeded maximum daily limits established by landfill permits issued to Empire by DEP.[2] Because various statutory fees payable to governmental units and royalty payments to a partnership known as the "FMKF Company" were based upon the amount of waste reported by Empire in the fraudulent statements submitted to DEP, the governmental units and FMKF Company were deprived of revenues to which they were otherwise entitled. As part of the parties' plea agreement, the parties stipulated that the loss sustained in connection with the under-reporting of waste equalled the product of the unreported excess tonnage during 1995 and 1996 (36,296 tons) multiplied by $4.75, yielding a result of $172,406.[3]

1. Hereinafter referred to as the Campaign Finance Fraud Case.

2. Hereinafter referred to as the Excess Waste Case.

3. The $4.75 per ton figure represented a $2.00 recycling fee, a $1.00 host community benefit fee, a $.25 post closure trust fund fee, and a $1.50 royalty payable to FMKF Company.

In late April and early May of 2001, the Probation Office finalized the Presentence Investigation Reports ("PSRs") for each of the remaining defendants.[4] For Mr. Mariani, the PSR recommends a guideline range of imprisonment of 30 to 37 months based upon an aggregate offense level of 19 and a criminal history category of I. For Mr. Serafini, the PSR recommends a guideline imprisonment range of 37 to 46 months based upon an aggregate offense level of 21 and a criminal history category of I. Finally, the PSR for Del Serra recommends a guideline prison sentence of 33 to 41 months based upon an aggregate offense level of 20 and a criminal history category of I.

Each defendant has interposed a number of objections which, if all were resolved in their favor, would produce for each defendant an aggregate offense level of 13 and a guideline prison term of 12 to 18 months. Common to both the Excess Waste and Federal Election Campaign Act Cases are objections to enhancements in each defendant's respective offense levels under USSG § 3B1.1 for their roles in the offenses. With respect to the Campaign Finance Fraud Case, each defendant challenged the PSRs use of the loss table in USSG § 2F1.1, resulting in a 7–level enhancement based upon the amount of illegal campaign contributions. Defendants Serafini and Del Serra objected to the recommended 2–level enhancements for obstruction of justice under USSG § 3C1.1 in connection with the Campaign Finance Fraud Case. Finally, each defendant objected to the recommendation in the PSRs that credit for acceptance of responsibility

be limited to a 2–point reduction in offense level, contending that they were entitled to an additional reduction of 1 level under USSG § 3E1.1(b).

On May 30, 2001, the Government filed a forty-page Memorandum in opposition to the defense objections. Prior to the submission of this Memorandum, the government had submitted voluminous materials in support of the recommendations set forth in the PSRs and in opposition to the defense objections.

On August 8, 2001, a pre-sentence conference was conducted with counsel for the parties. As a result of that conference, the defendants were directed to submit any pertinent documentation as well as memoranda of law addressing the sentencing issues by September 8, 2001. The government was directed to file a response to the defendants' submissions, and a sentencing hearing was scheduled for October 22, 2001. At the sentencing hearing, the parties expressed their assent to resolve the outstanding objections on the basis of the comprehensive written record. (October 22, 2001 Transcript at 2.)

## II. DISCUSSION

### A. The Applicable Guidelines Manual

As a general rule, the Guidelines Manual in effect at the time of sentencing is to be applied. See 18 U.S.C. § 3553(a)(4), (5); USSG § 1B1.11(a). If, however, use of the Guidelines Manual in effect at the time of sentencing would violate the ex post facto clause of the United States Constitution,

---

4. Stephens had entered a guilty plea on November 13, 2000, approximately one month before the other defendants entered their pleas. Stephens pled guilty to two counts of violating the prohibition on conduit contributions in 3:CR–97–225–04, and one count of mail fraud in 3:CR–98–307. On July 16, 2001, Stephens was sentenced to a term of

probation of two years with home confinement for six months. He also was required to make restitution of 10 percent of the loss incurred in connection with the mail fraud scheme. Stephens' sentence departed below his guideline range of 8 to 14 months as a result of the Government's motion based upon Stephens' substantial assistance.

the court is to use the Guidelines Manual in effect when the offense of conviction was committed. USSG § 1B1.11(b)(1); *United States v. Bertoli,* 40 F.3d 1384, 1403 (3d Cir.1994).

Effective November 1, 2001, the Sentencing Guidelines governing economic crimes were substantially revised. Section 2F1.1, covering fraud and deceit, was deleted by consolidation with USSG § 2B1.1. (*See* Appendix C, Amendment 617.) Under § 2B1.1 of the November 1, 2001, Guidelines Manual, the offense level for the Excess Waste Case, prior to adjustments for role in the offense and acceptance of responsibility, would be 16. This is determined by taking the base offense level of 6 and adding to it 10 levels because the loss was more than $120,000 but not more than $200,000.

Count I of the Excess Waste Case, to which each of the defendants has pled guilty, charged a conspiracy in existence from 1989 until January 22, 1997. For purposes of determining the applicable Guideline Manual covering a crime that spanned a considerable period of time, the last date of the criminal conduct determines the Guidelines Manual to be used. *See* USSG § 1B1.11, Application Note 2. The version of the Guidelines Manual in use at the time the conspiracy ended was that which took effect on November 1,

1996. Under the 1996 Guidelines Manual, conspiracy to commit mail fraud was governed by § 2F1.1. Under the 1996 Guidelines Manual, the offense level for each defendant, prior to adjustments for role in the offense and acceptance of responsibility, would be 15, calculated as follows:

> Base offense level of 6 plus a seven level enhancement for a loss to the victims of more than $120,000 but not more than $200,000 plus two levels for more than minimal planning.[5]

The 1996 Guidelines Manual produces an offense level of 15, below the results obtained applying the 2001 Guidelines Manual (offense level of 16). No party has argued that the 2001 Guidelines Manual has incorporated revisions that affect the assessment of the defendants' roles in the offense, obstruction of justice or their acceptance of responsibility. Accordingly, the 1996 Guidelines Manual must be used in determining the offense level for the Excess Waste Case.

While the parties have raised a substantial question as to which section in Chapter Two of the Guidelines Manual applies to the Campaign Finance Fraud Case, no party has argued that there is a section in the 2001 Guidelines Manual that applies to the Campaign Finance Fraud Case that would result in a lower aggregate offense level than that produced by the 1996

---

**5.** Effective November 1, 2001, the more than minimal planning enhancement no longer is applied in fraud cases. The fact that this enhancement has been eliminated does not mean that the defendants can avoid its application in this case. The Sentencing Commission has directed that "[t]he Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual." USSG § 1B1.11(b)(2). That is, the Court is to apply a single Guidelines Manual. As explained in Hutchison, Yellen, Hoffman, and Young, *Fed-*

*eral Sentencing Law and Practice,* § 1B1.11, p. 155 (2002):

> The one-book 'rule' tells the court to make two calculations. The first calculation is of the guideline range in effect at the time of the offense, which is determined by using only one book, the *Guidelines Manual* in effect on the date of the offense. The second calculation is of the guideline range in effect at the time of sentencing, which also is determined by using only one book, the *Guidelines Manual* in effect on the date of sentencing. The court is to sentence using the calculation that produces the lower guideline range.

Guidelines Manual after the adjustments called for in § 3D1.4 for unrelated multiple counts of conviction. In accordance with the "one-book rule," I will thus apply the 1996 Guidelines Manual to the Campaign Finance Fraud Case and to all other sentencing issues.[6]

## B. *The Excess Waste Case*

### 1. *Role in the Offense*

The PSRs recommend that defendants Mariani and Serafini each receive a four level enhancement for their respective roles in the Excess Waste Case, and that defendant Del Serra have his offense level increased by three points for his role in that crime. These enhancements are governed by USSG § 3B1.1, which provides:

Based on the defendants' role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The commentary accompanying § 3B1.1 explains that its purpose is to enhance the offense level in accordance with the size of the criminal organization and the degree of the defendant's responsibility within that organization. Section 3B1.1 requires the courts to assess both the criminal organization itself and the individual defendant's role in that organization.

### a. *Renato Mariani*

■ Mr. Mariani contends that an enhancement under § 3B1.1 is unwarranted as to him because he was not a leader, organizer, manager or supervisor in the scheme to under-report waste tonnage. He also asserts that, even if he occupied such a position, only a two-level increase is warranted because the criminal activity neither involved five or more "participants" nor was "otherwise extensive." These contentions will be addressed seriatim.

■ Section 3B1.1 "applies to situations where an individual is a leader or organizer of individuals who participate together in committing one or more criminal acts." *United States v. Belletiere,* 971 F.2d 961, 969 (3d Cir.1992). "[T]o be considered an organizer or leader, 'the defendant must have exercised some degree of control over others involved in the commission of the offense.'" *United States v. Helbling,* 209 F.3d 226, 243 (3d Cir.2000), *cert. denied,* 531 U.S. 1100, 121 S.Ct. 833, 148 L.Ed.2d 715 (2001). In determining whether the defendant is an organizer or leader, as opposed to a manager or supervisor, the court may consider such factors as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, Application Note 4.

The facts in this case support the conclusion that Mariani was the leader of the scheme to defraud. He authorized the use of a second computer to enable Empire to

---

**6.** Accordingly, unless otherwise indicated, reference to a guidelines section will be to the version contained in the 1996 Guidelines Manual.

accept excess tonnage while concealing the violations of its landfill permit from regulatory authorities. Moreover, Mariani instructed Del Serra to make sure that the excess loads were billed. (*See* Michael Serafini FBI 302 Report dated December 7, 2002.) When Alan Stephens refused to continue to sign fraudulent reports of the amount of waste that had been accepted at the landfill, it was Mariani who instructed Serafini to sign the reports. (*Id.*) Del Serra and Mariani had "almost daily discussions" about receipt of excess waste. (Del Serra FBI 302 Report of November 29, 2000.) When Del Serra told Mariani that he did not like the way Empire was handling the excess tonnage, Mariani responded, "It's my headache." (*Id.*) These facts show that Mariani exercised the final decision making authority to implement the scheme to defraud by having excess waste recorded on a second computer system. As a 25% owner of Empire, Mariani claimed a right to a larger share of the fruits of the crime. Mariani exercised direct control over, *inter alia,* Serafini and Del Serra in the implementation of the scheme. This is not a case where the defendant is being held accountable because of his position in the company. On the contrary, the facts show that Mariani was aware of the scheme, explicitly approved of it, and directed its implementation. Thus, Mariani is properly regarded as the scheme's leader.

Mariani insists that a 4–level enhancement is not appropriate because the scheme did not have five or more participants. In support of this argument, Mariani points out that conspiracy and mail fraud charges pertaining to the Excess Waste Case were brought against only four persons.[7] Mariani asserts that, because there were only four "participants"

in the conspiracy to commit mail fraud, a 4–level enhancement based upon the existence of a criminal organization involving at least five "participants" cannot be substantiated.

Application Note 1 to § 3B1.1 defines a "participant" to be "a person who is criminally responsible for the commission of the offense, but *need not have been convicted.*" (Emphasis added.) Thus, the fact that only four persons have pled guilty in the Excess Waste Case does not preclude a finding that the scheme included five or more participants. Notably, the Bill of Particulars requested by the defendants in this case identified two Empire scale operators—Gary Butler and Donald Hallock—as unindicted co-conspirators in the Excess Waste Case. Butler and Hallock were identified as co-conspirators specifically in connection with paragraphs 15 and 16 of the Indictment, which charged:

> 15. The defendants and their co-conspirators authorized and directed Empire employees to accept thousands of tons of solid waste at the landfill in excess of (1) what was reported to DEP, the host-municipalities, and other entities that received fees based on the amount of waste received at the landfill, and (2) Empire's permitted maximum daily volume.
>
> 16. The defendants and their co-conspirators then set up a system to keep track of the excess solid waste for billing purposes, yet conceal its existence from DEP, the host municipalities, the trustee, and the other entities that were entitled to receive a per-ton fee based on the amount of solid waste disposed of at the landfill.

The evidence tendered by the government in this sentencing proceeding sup-

---

7. There is no dispute that the defendant being sentenced is counted as one of the "participants" for purposes of determining an adjust-

ment in offense level based upon that defendant's role in the offense. *See United States v. Colletti,* 984 F.2d 1339, 1346 (3d Cir.1992).

ports the conclusion that both Butler and Hallock were criminally culpable participants in this scheme to defraud. Butler conceived the idea to establish a second computer in the location where trucks were weighed for purposes of accepting waste in excess of Empire's permitted daily maximum. He did so with the understanding that the second computer system would enable Empire to conceal from DEP violations of permit restrictions on the amount of waste that Empire could accept each day. Hallock confirmed the existence of a second computer that was used to record loads that exceeded Empire's maximum daily tonage. He acknowledged operating the second computer on ten occasions. Hallock's testimony supports an inference that he understood that the purpose of the second computer was to enable Empire to conceal from DEP Empire's receipt of excess waste.

■ Even if Butler and Hallock were not criminally culpable co-conspirators in the mail fraud scheme, they qualify as "participants" for purposes of § 3B1.1(a). Our Court of Appeals has held that "[t]he participants need not each be criminally culpable of the charged offense, but must be criminally culpable of 'the underlying activities ... that directly brought about the more limited sphere of the elements of the specific charged offense.'" *United States v. Belletiere*, 971 F.2d at 969, (*quoting United States v. Inigo*, 925 F.2d 641, 659 (3d Cir.1991)). As pointed out by the Government, the scale operators' knowing receipt of waste in excess of Empire's daily limits violated Pennsylvania statutory provisions that carry criminal penalties. *See* 53 P.S. § 4000.1705. State law specifically provides that "[n]o person ... operating a municipal waste landfill may receive solid waste at the landfill in excess of the maximum or average daily volume approved in the permit by [DEP] ...." 53 P.S. § 4000.1112(a). The scale operators' knowing violations of state law enabled the

commission of the mail fraud scheme. Thus, the scale operators, particularly Butler and Hallock, must be counted as "participants" for purposes of determining an adjustment in offense level under § 3B1.1(a).

■■ Finally, even if the scale operators had no criminal culpability in connection with the Excess Waste Case, a 4–level enhancement in the offense score for Mariani would be warranted because the criminal activity qualifies as "otherwise extensive." In *United States v. Helbling, supra,* our Court of Appeals held that, in determining whether criminal activity is "otherwise extensive" for purposes of determining role in the offense enhancements, the focus must be on "the number of participants, and the knowing or unknowing persons, involved in the criminal activity, and then a subsequent determination must be made as to whether the roles and involvement of all persons constitute the functional equivalent of five 'participants' as defined by the Application Notes." *Id.* at 244, *citing United States v. Carrozzella,* 105 F.3d 796 (2d Cir.1997). As noted above, there is no dispute that there were at least four participants in the conspiracy to commit mail fraud. The question thus narrows to whether others involved in the scheme, although perhaps not qualifying as "participants," should be considered for purposes of determining whether there is the functional equivalent of at least one other participant in the scheme. In *Helbling,* the Court directed that trial judges "determine whether the defendant used ... non-participants' services with specific criminal intent," and then "determine the extent to which the services of each individual, non-participant, were peculiar and necessary to the criminal scheme." 209 F.3d at 248. Under this test, "individuals used by the defendant to legitimize, facilitate or hide the

criminal activity" may be considered for purposes of determining whether the criminal activity was "otherwise extensive." *Id.*

In this case, there is no question that the scale operators were used by the defendants with the specific intent to conceal from DEP the receipt of excess waste by Empire. The Government has identified, in addition to Butler and Hallock, at least three other scale operators (John Thomas, Thomas Riccardo, and Michael Doran) whose services were enlisted in the operation of a second computer to record the acceptance of excess waste while concealing that fact from DEP. Moreover, Brenda Keen, an employee in the Empire Accounting Department, was used to generate invoices to those landfill clients whose waste exceeded daily limits and then made accounting entries and destroyed records in order to conceal the excess waste from DEP. The services of the scale operators and Keen were both peculiar and necessary to the criminal scheme. The actions and services of these non-participants plainly "relate[d] to the common criminal activity or scheme—and the offense charged." *United States v. Antico,* 275 F.3d 245, 270 (3d Cir.2001). Taken together, the five scale operators and Keen plainly amount to the functional equivalent of at least one other participant. Thus the criminal activity was "otherwise extensive" for purposes of a four-level enhancement for Mariani's leadership role in the Excess Waste Case.

### b. *Michael Serafini*

■ The PSR for Michael Serafini recommends that he receive a four level enhancement for his role in the offense as leader or organizer. Serafini contends that there should be no adjustment for his role in the Excess Waste Case because he did not exercise " 'some degree of control over others involved in the commission of the offense.' " *Belletiere,* 971 F.2d at 969.

Contrary to Serafini's contention, the evidence shows that he supervised the activities of the scale operators. In this regard, the evidence discloses that the scale operators sought Serafini's authorization to exceed daily waste limits. As indicated above, the scale operators qualify as participants in the scheme. Thus, the threshold question of whether Serafini exercised some degree of control over other participants must be answered in the affirmative.

A more difficult question is whether Serafini should be regarded as an "organizer" or "leader" in the Excess Waste Case, as recommended in the PSR. As noted above, the Application Notes direct the court to consider such matters as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, Application Note 4. It is also clear that more than one person may qualify "as a leader or organizer of a criminal association or conspiracy." *Id.* In this case, although Serafini exercised day-to-day discretionary decision making authority as to whether landfill permit limits should be exceeded, the ultimate decision making authority to undertake the scheme with use of a second computer resided with Mariani. There has been no showing that the scheme could have been effectuated without Mariani's explicit assent. Nor has there been any showing that Serafini himself profited from the scheme. In this regard, the partnership in which he claimed a share of royalties was a victim of the scheme to defraud. That is, Serafini was deprived of royalty payments to which he was otherwise entitled as result of the scheme. Moreover, Serafini did not concoct the

scheme to use a second computer to mask receipt of excess waste. He played the role of relating Butler's idea to Mariani, and then relating to Butler Mariani's approval. Under these circumstances, Serafini is more properly regarded as having been a "manager" or "supervisor" in the Excess Waste Case. As the criminal activity involved five or more participants and, in any event, was "otherwise extensive," a three-level enhancement for Serafini's part in the Excess Waste Case is warranted.

#### c. *Leo Del Serra*

■ The PSR for Del Serra recommends a 3–level enhancement for his role as a "manager" or "supervisor" in the Excess Waste Case. Del Serra objects to this recommendation, asserting that he did not exercise any control over another participant in the scheme to defraud.

The evidence shows that Del Serra instructed Brenda Keen as to the manner in which the excess waste was to be billed and hidden on Empire's accounting records. Keen, identified as a co-participant in the mail fraud counts in the Government's Bill of Particulars, testified that Del Serra instructed her to make adjusting journal entries that would permit Empire to conceal receipt of excess waste while allowing Empire to bill customers for such excess waste. Del Serra confessed to the FBI that Keen had to "cut and tape" the necessary information to marry the two reports (from the separate computers operated by the scale operators) together to form a single bill. (Government Exhibit 35 at p. 1.) Keen further related that she was instructed by Del Serra to discard reports from the second computer along with the scale tickets for excess waste. (GX 29 at 48–49.) The evident purpose for the manner in which excess waste was billed, adjusting journal entries were made, and records were discarded was to conceal the receipt of the excess waste. The facts of record support an inference

that Keen was a knowing participant in the mail fraud scheme. That is, the evidence supports a rational inference that Keen knew that reports to regulatory authorities did not include excess waste and that her actions facilitated concealment of this fact. As it is evident that Del Serra supervised her activities in connection with the Excess Waste Case, a 3–level enhancement in his offense score is warranted.

#### 2. *Offense Level Calculation in the Excess Waste Case*

The calculation of the offense levels for the defendants in the Excess Waste Case is governed by § 2F1.1 of the 1996 edition of the Guidelines Manual. This section calls for a base offense level of 6. There is no dispute that an enhancement of seven levels based upon the amount of loss is warranted. *See* USSG § 2F1.1(b)(1)(H). There is also no dispute that a 2–level increase for more than minimal planning is warranted. *See* USSG § 2F1.1(b)(2). Including the enhancements for role in the offense, the total offense level for each defendant in the Excess Waste Case is as follows:

Mariani—19
Serafini—18
Del Serra—18

#### C. *The Campaign Finance Fraud Case*

#### 1. *The Appropriate Guidelines Section*

■ The first step in determining the sentencing range applicable to a particular defendant is to ascertain the pertinent offense guideline section in Chapter Two of the Guidelines Manual. *See* USSG § 1B1.1(a). The crime of conspiracy is treated in § 2X1.1, which directs that the Court apply "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can

be established with reasonable certainty." One of the objects of the conspiracy was to knowingly and willfully cause others to make false statements to the FEC in violation of 18 U.S.C. § 1001. Offenses under 18 U.S.C. § 1001 are governed by USSG § 2F1.1. The PSRs accordingly recommend that § 2F1.1 be applied for purposes of calculating the offense level for the Campaign Finance Fraud Case.

Initially, neither the defendants nor the Government objected to the use of § 2F1.1 in the Campaign Finance Fraud Case. After the defendants objected to an enhancement in the offense level under § 2F1.1 based upon the amount of alleged "loss," the Government asserted that the offense may actually be governed by some other section of Chapter Two of the Guidelines.

As pointed out by the Government, § 1B1.2(d) of the Guidelines directs that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." In this case, the conspiracy to which the defendants pled guilty charged three objectives in addition to the objective to cause others to make false statements to the FEC in violation of 18 U.S.C. § 1001. Specifically, the defendants were charged with conspiring to defraud the United States by impairing, impeding, defeating and obstructing the lawful functions and duties of the FEC in violation of 18 U.S.C. § 371; knowingly

and willfully making and causing to be made corporate contributions to federal candidates and their political committees in violation of 2 U.S.C. § 441b; and knowingly and willfully making and causing to be made contributions to federal candidates and their political committees in the names of third persons in violation of 2 U.S.C. § 441f. The Government concedes that "there is no specific guidelines section for the other three objects of the conspiracy." (Government's Response in Opposition to Defendants' Objections to the PSR at 9.) Citing USSG § 1B1.2(a), the Government asserts that the Court should determine the "most analogous guideline" applicable to each of the objects of the conspiracy, and then use the guideline section that produces the greatest offense level.[8] The defendants have responded to the Government's position by asserting that there may not be a sufficiently analogous guideline section so that the court may be required to impose an appropriate sentence without reference to the guidelines. *See* USSG § 2X5.1.[9]

Having carefully considered the alternative guideline sections proposed by the Government as well as the defendants' suggestion that the Campaign Finance Fraud Case may not be within the heartland of any guidelines section, I have come to the conclusion that section 2F1.1 should be applied here. This conclusion is compelled for several reasons. First, § 2F1.1 explicitly applies to the second objective of the conspiracy—to cause the submission of

---

8. Section 2X5.1 of the Guidelines in effect in 1996 directed that "[i]f the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline."

9. Section 2X5.1, in pertinent part, provides:

If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) shall control, except that any guidelines and policy statements that can

be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable.

Section 3553(b) of title 18 U.S.C., in pertinent part, provides that "[i]n the absence of an applicable sentencing guideline, the Court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2)." Subsection (a)(2) of § 3553 lists the factors to be taken into account in determining an appropriate sentence.

false statements to the FEC in violation of 18 U.S.C. § 1001. *See* USSG, App. A. As the Government has acknowledged, the other objectives of the conspiracy are not explicitly covered by a Chapter Two guidelines section. Where, as here, the facts support a conclusion beyond a reasonable doubt that a defendant engaged in a multi-objective conspiracy, and only one of the objectives of which the defendant is guilty is explicitly governed by a Chapter Two guideline section, that guideline section should control, rather than the Court engaging in a labyrinthian inquiry to find the "most analogous" guideline section for each of the other objectives and then use the guideline section that produces the highest offense level.[10] Such an approach has the salutary effect of providing fair notice to the accused of the probable sentencing range in a multi-object conspiracy. This bright line approach also advances the Sentencing Guidelines' goals of achieving consistency and uniformity in sentencing. Requiring the sentencing court to find the most "analogous" section for another object of the conspiracy creates the probability that different judges will arrive at different conclusions. The absence of a bright line approach encourages litigation over the issue, creates unnecessary complexity in the sentencing process, and prompts delay in the disposition of cases. Finally, using the section directly applicable to one objective is consistent with the 2000 Amendments to Section 1B1.2, which now *require* sentencing courts to use the offense guideline listed in the Statutory Index, rather than determining the "most applicable" offense guideline. As explained in one treatise:

> Under this revised guideline, if there is *any* offense guideline applicable to the offense of conviction listed in Appendix A, but the court finds that there is a more appropriate offense guideline applicable to the offense of conviction that is not listed, it may not apply that guideline directly, as it could previously, but only by way of a departure.

*Federal Sentencing Law and Practice, supra* § 1B1.2 at p. 47 (2002) (emphasis added). In this case, there is an offense guideline applicable to the offense of conviction, and it should be applied here in the absence of a determination that a departure based on some other guideline section is warranted.[11]

---

**10.** The sentencing court is to apply the guideline section applicable to an object offense alleged in a conspiracy count "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense." Although the queries put to the defendants during the plea colloquy did not explicitly encompass the conspiracy to violate 18 U.S.C. § 1001, (Plea Transcript of December 4, 2000 at 42–43), the facts related by the Government during the colloquy support a conclusion, beyond a reasonable doubt, that each defendant conspired to commit that object offense. Specifically, the Government asserted:

> This long standing pattern of using conduits or straw parties evidenced the defendants' intent to interfere with the accurate reporting of campaign contributions by the campaign committees. The Defendants understood that this information on the source of the funds would be transmitted to Treasurers of these various campaign committees who would in turn transfer that information to the Federal Election Commission and reports would be generated indicating that these people were the actual and legitimate contributors for these funds. This false information was conveyed to the Federal Election Commission on numerous and separate occasions ..., and the Defendants were aware that this information would be used by those entities in creating those false reports.

*(Id.* at 40–41.) The defendants acknowledged that the Government's proof would encompass these facts. *(Id.* at 41–42.) Such proof would support a conviction of conspiracy to violate 18 U.S.C. § 1001.

**11.** It should be noted that in *United States v. Ferrouillet,* No. CRIM. A. 96–198, 1997 WL 266627 (E.D.La. May 20, 1997), *aff'd sub*

In any event, alternative guideline sections proposed by the Government for the other objects of the conspiracy are not sufficiently analogous to be applied here. Section 2C1.7, concerning fraud involving the deprivation of the intangible right to the honest services of public officials and conspiracy to defraud by interference with governmental functions, "applies only to offenses committed by public officials or others acting with them . . . ." Application Note 1. This condition is not satisfied here. The higher base offense level of 10 and the 8 level enhancement if an elected official is involved reflect the greater seriousness of an offense involving the participation of a public official.

The Government points out that § 2C1.7 concerns not only an offense that deprives others of the intangible right to the honest services of public officials, but also conspiracy to defraud the United States by interfering with governmental functions. It claims that the false reports to the FEC interfered with the lawful government function of enforcement of the campaign finance laws. But this effect is the product of the violations covered by 18 U.S.C. § 1001. Stated otherwise, any false statements conviction under § 1001 could be said to interfere with governmental functions. Because offenses under § 1001 are covered by § 2F1.1, § 2C1.7 should not be

used absent the involvement of a public official in the commission of the offense.[12]

The Government argues that the third and fourth objects of the conspiracy—to consent to and cause illegal corporate contributions in violation of 2 U.S.C. § 441b, and to make and cause to be made conduit contributions in violation of 2 U.S.C. § 441f, should be governed by USSG § 2C1.2. This guideline section concerns the "Offering, Giving, Soliciting, or Receiving A Gratuity." Were it applied here, the offense level, prior to adjustments for role in the offense, would be 17.[13]

Section 2C1.2 applies to violations of 18 U.S.C. § 201(c)(1). As pointed out by the defense, § 201(c)(1) requires "a specific and express *quid pro quo* between whatever consideration is tendered to a public official and the public official's conduct." (Mariani Sentencing Memorandum at 3–4.) The Government asserts that this condition is satisfied here because the defendants were looking for favorable action on interstate waste legislation. Most contributors to political campaigns, of course, hope that the supported candidate will take action favorable to the contributors' position. Thus, the fact that the contributions at issue here were made with the hope of influencing the candidates' positions is not sufficient to show "a specific intent to give . . . something of value in

*nom., United States v. Hemmingson,* 157 F.3d 347 (5th Cir.1998), the court determined that an illegal campaign contribution case, prosecuted as a money laundering crime, should be governed by § 2F1.1 for sentencing purposes and not the money laundering guideline, explaining that with respect to "the objective of the criminal conduct—concealment of prohibited corporate contributions—there is little difference between defendants' conduct in this case and the conduct in a typical fraud case." *Id.* at *10. This reasoning supports use of § 2F1.1 here. The defense has also presented information that other courts have used § 2F1.1 as the applicable Chapter Two guideline section in cases involving illegal

campaign contributions, citing *United States v. Riady, United States v. Huang,* and *United States v. Hsia.*

**12.** If 2C1.7 were applied here, the offense level prior to enhancements for role in the offense would be 18, as opposed to 15 under § 2F1.1.

**13.** This result is obtained by adding to the base offense level of 7 two additional points because there was more than one challenged contribution and then increasing that total by 8 additional levels because the contributions were made to an elected official.

exchange for an official act." *United States v. Sun–Diamond Growers,* 526 U.S. 398, 404, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999). To hold otherwise would imply that political contributions generally would fall within the ambit of § 201(c)(1), an implication carrying grave constitutional concerns. Moreover, if the object of the conspiracy was to commit the felony of bribing a public official or making an illegal gratuity, the indictment should have charged that object, as opposed to the object of committing the misdemeanors of making illegal corporate and conduit contributions. Thus, Section 2C1.2 is not sufficiently analogous here.[14]

As to the contention that the Court should view this case as not covered by any guideline section, the finding that an object of the conspiracy was to violate 18 U.S.C. § 1001 precludes such an approach. As there is a directly applicable Chapter Two guidelines section, that section will be applied here.

### 2. *Adjustment in Offense Level Based upon the Amount of Illegal Contributions.*

■ Section 2F1.1 prescribes a base offense level of 6, with an upward adjustment based upon the amount of "loss." In this case, the PSRs recommend that the total amount of illegal campaign contributions—$129,000—be regarded as the "loss," yielding a seven point increase in the offense level. *See* USSG § 2F1.1(b)(1)(H). The defendants object to the use of the loss table in § 2F1.1, insisting that their scheme did not inflict a "loss" on any victim. The Government counters that Empire sustained a "loss" equal to the amount of corporate funds funneled to campaign coffers through conduit contributors.

"Loss" is defined as "the value of the money, property, or services *unlawfully* taken." USSG § 2F1.1, Application Note 7. While the government asserts that use of corporate funds to make campaign contributions was an *ultra vires* act, it cites no authority for the proposition that the money was "unlawfully taken" from Empire. The Government only asserts that "[i]t was simply illegal for [the defendants] to disburse corporate funds for ... purposes [of making campaign contributions.]" Similarly, it would be unlawful for an individual to make contributions in excess of allowable limits. It could not be said, however, that the person who made the illegal contributions sustained a "loss" because it was unlawful for him to do so. In this case, the contributions came from a corporate entity controlled by one of the defendants. The corporation, in fact, was prosecuted for making the unlawful contributions. It would be inappropriate, in these circumstances, to find that Empire sustained a "loss" in the form of the illegal contributions. It was not the intended victim of the fraudulent scheme; the FEC was.[15]

---

**14.** It should be noted that in Alan Stephens' case, the guideline section for the Campaign Finance Fraud Case was § 2C1.2. No party objected to the applicability of that section to the offenses of conviction—Counts 83 and 84 of the Indictment. Those counts concerned contributions to the Dole for President Campaign, one made in Stephens' name and the other in his wife's name. Stephens received a four-level reduction in offense level based upon his minimal participation in the crime. Moreover, the government moved for a downward departure based upon Stephens' substantial assistance, enabling the Court to sentence Stephens to a term of probation. Stephens did not plead guilty to the conspiracy count, but to the substantive offense of being a conduit for illegal campaign contributions. The fact remains that § 2C1.2 does not directly control any of the objects of conspiracy, but § 2F1.1 does. Under these circumstances, the use of § 2C1.2 in Stephens' case is not entitled to significant weight in sentencing the other defendants.

**15.** Although it is possible that "an individual or entity was both a victim and a participant," *United States v. Badaracco,* 954 F.2d 928, 934 (3d Cir.1992), the term "victim"

The Government alternatively argues that Empire realized a "gain" equal in the amount of the illegal contributions for "the improper influence the defendants bought through the illegal contributions." (Government's Response in Opposition to Defendants' Memoranda relating to the Objections to the PSR at 7.) The Government has not presented any evidence that the defendants obtained any influence by virtue of the illegal contributions. Nor has the government cited any authority for the proposition that a defendant should be treated as having realized a "gain" in making illegal campaign contributions. Thus, this alternative approach is not warranted.

There can, of course, be "no loss" cases under § 2F1.1. *See e.g., United States v. Kopp,* 951 F.2d 521 (3d Cir.1991). That does not mean that the amount of money involved in the offense should be disregarded. Application Note 10 to § 2F1.1 authorizes consideration of an upward departure where a loss determination "does not fully capture the harmfulness and seriousness of the conduct . . . ." Application Note 13 recognizes that a departure from the guidelines may be considered in cases prosecuted under 18 U.S.C. § 1001. This is such a case.

Although no "loss" was sustained, the criminal activity was extensive, protracted, and substantial. Illegal contributions were made to approximately 10 candidates. The contributions spanned several election cycles. At least $129,000 was improperly funneled to campaign coffers. The conduct at issue was detrimental to our electoral system, serving to reinforce entrenched cynical views concerning the corrupting influence of corporate treasuries and wealthy contributors on the electoral process.

must have reference to the offense of conviction. In this case, the intended victim was

Our Court of Appeals has instructed that, in making departures, the sentencing court should resort to analogic reasoning based upon the guidelines. *United States v. Kikumura,* 918 F.2d 1084, 1113–14 (3d Cir.1990). A number of guideline sections dealing with economic crimes provide for adjustments based upon the amount of money involved. *See e.g.,* § 2B3.3 (blackmail and similar forms of extortion); § 2B5.1 (offenses involving counterfeiting); § 2B5.3 (criminal infringement of copyright or trademark); § 2C1.1 (bribery under 18 U.S.C. § 201(b)(1), (2), 872, 1951); and § 2C1.2 (bribery or illegal gratuity under 18 U.S.C. § 201(c)(1)). These and other sections express a recognition by the Sentencing Commission that there is a direct relationship between the severity of the offense and the amount of money involved. It is thus appropriate in this case to adjust the offense level based upon the amount of illegal contributions made. Accordingly, the offense level will be increased by 7 points to reflect the seriousness and harmfulness of the defendants' conduct as represented by the amount of illegal contributions that were made.

### 3. *Role in the Offense Enhancements.*

The PSRs recommend that Mariani and Serafini each receive 4–level enhancements for their roles as leaders and organizers of the Campaign Finance Fraud Case, and that Del Serra be given a 3–level enhancement for his role in the offense. Each defendant objects to the enhancement, contending that he did not occupy a leadership or managerial position in the offense and that the criminal activity did not involve the requisite number of participants or extensiveness.

the FEC, not Empire.

The factual premise for the enhancements can be found in paragraph 18 of the PSR. Mariani has not objected to the factual accuracy of that paragraph, which essentially provides that Mariani, along with Serafini, identified candidates they wished to support and determined the level of support. Contributions would either be made by the defendants themselves, who were then reimbursed with corporate funds disguised by Del Serra as bonuses or expense reimbursements, or obtained from Empire employees, business associates, friends and family members who were solicited by Mariani, Serafini, Del Serra and Stephens. Some conduits were reimbursed by a corporate check disguised by Del Serra as a legitimate business expense, or reimbursed by Serafini or Del Serra, who would in turn be reimbursed by a corporate check disguised by Del Serra as either a bonus or a purported legitimate business expense.

 It is evident from this factual recitation that Mariani occupied a leadership role in this criminal scheme. He exercised decision making authority as to the identity of candidates to support, the level of support, and the degree to which contributions would be reimbursed with corporate funds. He recruited accomplices by soliciting contributions from others. In connection with this criminal activity, he exercised some degree of control over at least one other culpable participant, Serafini. In his own version of the offense, Mariani acknowledged that he "authorized Mr. Serafini to reimburse the vast majority of the individual contributors . . . ." This assertion reflects his exercise of control over Serafini and over the scheme itself. According to Serafini, when Mariani was confronted about the propriety of the reimbursement scheme, he told Serafini, "Don't worry about that, I'm the one who will get in trouble, not you." (Serafini FBI 302 Report, GX-34, at p. 5.) As the Government summarized, Mariani "chose the means, participated in the scheme as a conduit and recruited others, identified the candidates, authorized the disbursal of funds, and delivered the monies." (Government's Response in Opposition to Defendants' Memoranda Relating to the Objections to the PSR at 43.) Mariani was not a corporate executive who was unaware of the scheme. He was deeply involved in the matter in both its organization and execution. Regarding him as the leader of the activity is thus plainly warranted.

Mariani nonetheless asserts that the Campaign Finance Fraud Case did not involve five or more criminally culpable participants. This assertion is meritless. In addition to the four defendants charged with conspiring to violate the campaign finance laws (Mariani, Serafini, Del Serra and Stephens), there were a number of other criminally culpable participants. For example, Frank Serafini knew that it was unlawful to be reimbursed for a contribution, accepted the reimbursement, and later lied about it. While he may not have been involved in the conspiracy itself, the definition of "participant" encompasses those whose criminal conduct made the commission of the charged offense possible. Frank Serafini falls within this category. Stacey Selig, Michael Serafini's secretary, also was a culpable participant in the scheme. She testified that, as Serafini's secretary, she followed his instructions by issuing checks from his personal account to various conduits knowing they were reimbursement checks. In fact, she acknowledged being reimbursed for contributions made by her and her husband.

The Government has also established that it is more likely than not that the conduits were culpable participants in the scheme. In this regard, the Government has shown that forms completed by the conduits included certifications that the conduits were not reimbursed and the con-

tributions were not made from corporate funds. Moreover, those who gave repeatedly would understand that they were serving as conduits to avoid the corporation taking responsibility for making the contributions.

Even if the conduits were not criminally culpable, their participation in the scheme was essential to its accomplishment. They were clearly used by the defendants with the specific criminal intent of evading the campaign contribution laws. There were more than 70 conduit contributors other than the defendants. Plainly, there were the equivalent of at least five participants in this scheme for purposes of determining that the activity was "otherwise extensive." *See Helbling*, 209 F.3d at 248. Thus, the four level enhancement in Mariani's offense level is warranted.

■ As to Michael Serafini, he supervised the work of his secretary, Stacey Selig, in effectuating the reimbursement of conduits. Selig testified before the grand jury that she wrote a number of checks on the account of Michael Serafini and Melinda Mancotte with the understanding that the checks were intended to reimburse persons who had made contributions to the Dole for President Committee. (Selig Grand Jury Testimony at 41.) In fact, she had been reimbursed for contributions made by her and her husband. At trial, Selig confirmed that the purpose of checks she was instructed by Serafini to write was to reimburse conduits. (Trial Tr. of 8/11/99 at 161–64.) The evident purpose of the reimbursement checks was to circumvent restrictions imposed by campaign finance laws. Thus, Selig aided and abetted

Serafini's criminal conduct. Serafini's role in the offense included soliciting contributions and effecting the reimbursements. In the Campaign Finance Fraud Case, his participation was more than a manager or supervisor; he was an organizer. It is therefore appropriate that he receive a four-level enhancement for his participation in the Campaign Finance Fraud Case.

■ While Del Serra's participation in the Campaign Finance Fraud Case was extensive, the Government has not shown that he exercised some degree of control over another participant in the scheme. In this regard, although it is clear that Del Serra supervised the work of Diane Bratlee, it is not clear that Bratlee was aware that checks coded as reimbursement for travel and entertainment or as bonuses were actually reimbursements for political contributions.[16] The exercise of some degree of control over a criminally culpable participant is a prerequisite for a role in the offense enhancement. Because the Government has not shown that Del Serra exercised such control over a participant in the scheme, an enhancement under § 3B1.1 is not warranted as to Del Serra.

### 4. *Obstruction of Justice Enhancements*

■ The PSRs recommend a two-level enhancement under USSG § 3C1.1 as to Serafini and Del Serra for their alleged obstructive conduct. Section 3C1.1 calls for a two-level increase in the offense score if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of an investiga-

16. In contrast to Selig, Bratlee testified that she was unaware of the real purpose served by checks Del Serra instructed her to prepare. She followed Del Serra's directions as to the accounting codes used to identify the purpose of the checks, and assumed that the codes accurately reflected the purposes of the checks. (Bratlee Grand Jury Testimony at 45–46, 68–76.) Although she was reimbursed for a contribution, the Government has not shown that she knew she was assisting the violation of campaign finance laws by accounting entries Del Serra directed her to make.

tion, prosecution or sentencing of the offense of conviction. The PSRs recommend that the enhancement apply to Del Serra and Serafini based upon their pressuring Peter Blasi, an accountant employed at Empire, into signing a false statement indicating that he was not reimbursed for his contribution, and their attempts to coerce two empire consultants, Rick Bodner and Thomas Earl, into signing similar statements. In responding to the defense objections, the Government has added that the obstruction of justice enhancement is appropriate as to Serafini because of his conduct in procuring a friend, Robert Giglio, to give perjured testimony to a grand jury in connection with this offense. As to Del Serra, the Government contends that his submission of a statement falsely denying that he and his wife were reimbursed constitutes another act of impeding or obstructing an investigation into the offense.

It is clear that Serafini requested his good friend, Robert Giglio, to lie to the grand jury about the reimbursement scheme, and that Giglio gave such false testimony. There is no dispute that Serafini was aware of the grand jury investigation. Thus, the two level enhancement for obstruction of justice is plainly appropriate as to Serafini, regardless of questions he has raised with respect to his attempts to pressure Blasi, Bodner and Earl into providing false written denials of the fact that they were reimbursed for their contributions.

As to Del Serra, the obstruction of justice enhancement is warranted if he impeded or attempted to impede an investigation that was "based on the criminal conduct underlying the specific statutory offense for which [he] is being sentenced." *United States vs. Imenec*, 193 F.3d 206,

208 (3d Cir.1999). It is not necessary that the Government show that Del Serra was aware of the investigation. *See United States v. Jenkins*, 275 F.3d 283, 287–88 (3d Cir.2001); *United States v. Snyder*, 189 F.3d 640, 648 (7th Cir.1999); *cert. denied*, 528 U.S. 1097, 120 S.Ct. 839, 145 L.Ed.2d 705 (2000). It is sufficient that the obstructive conduct occurred after the investigation began. *Jenkins*, 275 F.3d at 289.

The Government has shown that the likelihood of Empire's reimbursement of campaign contributions was first disclosed in major newspapers on April 25, 1996. The following day, investigators in the Eastern District of Pennsylvania who were pursuing a criminal prosecution against Mariani, undertook to investigate the matter of the campaign contributions. On that same date, Del Serra met with Blasi in an attempt to coerce him into signing a statement denying he was reimbursed for a contribution made to the Dole for President campaign. These facts are sufficient to support an inference that Del Serra engaged in conduct that would impede an investigation into the offense in question after an investigation had begun.

Furthermore, it is undisputed that on April 25, 1996, Del Serra signed a statement denying that he and his wife had been reimbursed for contributions to the Dole for President campaign. He turned the statement over to counsel for Empire. Shortly thereafter, the Middle District grand jury investigation was commenced. At no time during the investigation did Del Serra retract his false statement that he was not reimbursed for his contributions. Conduct undertaken before an investigation has commenced may be considered under § 3C1.1 where it is not withdrawn by the time the investigation is undertaken. *Snyder*, 189 F.3d at 648–49.[17]

---

**17.** I agree that the evidence is too ambiguous and vague to support a conclusion that Del

Serra was involved in an attempt to procure false statements from Earl and Bodner. The

### 5. Summary of Offense Level Calculations

Adding the base offense level of six in § 2F1.1, the seven level upward departure based upon the amount of illegal campaign contributions, the two level enhancement for more than minimal planning, and the four level enhancement for his leadership role in the offense, Renato Mariani's offense level score in the Campaign Finance Fraud Case is 19. Under the guidelines provision governing multiple counts, his score is enhanced by an additional two levels. *See* USSG § 3D1.4. Prior to adjustment for acceptance of responsibility, Renato Mariani's offense level is 21.

Michael Serafini's offense score for the Campaign Finance Fraud Case is two greater than Mariani's because of the enhancement for obstruction of justice. Applying § 3D1.4, Serafini's total offense score for both offenses is 23.

Del Serra's score for the Campaign Finance Fraud Case is 17, computed by adding to the base offense level of six, the seven level upward departure based upon the amount of the illegal campaign contributions, two levels for obstruction of justice, and two levels for more than minimal planning.[18] Because Del Serra's offense score for the Excess Waste Case is greater than his score in the Campaign Finance Fraud Case, the two level enhancement for multiple counts is added to that higher score of 18, producing a total offense level for both cases of 20.[19]

### D. Adjustment for Acceptance of Responsibility

Section 1B1.1(e) calls for an adjustment in offense level for acceptance of responsibility after all other adjustments for offense level have been made, including the adjustment for multiple counts of conviction. There is no dispute that each defendant has clearly demonstrated acceptance of responsibility, warranting a two level decrease in the offense score. *See* USSG § 3E1.1(a). The defendants contend that they are entitled to an additional decrease of one offense level under § 3E1.1(b), which applies where the defendant has either timely provided complete information to the government concerning his own involvement in the offense or timely notified authorities of the intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.

The Government contends that the additional level of credit for acceptance of responsibility should not be applied here because the defendants vigorously litigated a number of pretrial issues and did not plead guilty until the eve of the trial in the Excess Waste Case. Trial in the Campaign Finance Fraud Case, however, was not to

---

evidence as to Serafini's involvement with Bodner and Earl, however, further supports the obstruction of justice enhancement as to him.

18. Del Serra objected to the two level enhancement for more than minimal planning as applied to him. This objection is plainly meritless. Application Note 1(f) to section 1B1.1 defines the term "more than minimal planning" to encompass "repeated acts over a period of time, unless it is clear that each instance was purely opportune." In this case, Del Serra solicited a number of campaign contributions. He also was responsible for the making of false entries into the corporate books and records to conceal the making of illegal contributions for a number of campaigns over an extended period of time. Thus, the two level enhancement for more than minimal planning is clearly appropriate as to Del Serra.

19. It bears noting that even if the two level enhancement for obstruction of justice were not applied to Del Serra in the Campaign Finance Fraud Case, his aggregate offense level would be 20 as his score in that case would be within 4 levels of his score in the Excess Waste Case.

be held until about four months after the guilty pleas were entered. Moreover, the defendants pled guilty in the Campaign Finance Fraud Case within a week of the Supreme Court's denial of certiorari in connection with their constitutional challenge to that prosecution.[20] While the defendants may not have been entitled to an additional one level reduction for acceptance of responsibility in the Excess Waste Case, their pleas to the Campaign Finance Fraud Case enabled the Government to avoid preparing for that protracted trial and indeed permitted the court to allocate its resources efficiently. Under these unique circumstances, I find that the defendants are entitled to an additional one level reduction for acceptance of responsibility under § 3E1.1(b)(2).

## III. CONCLUSION

Based upon the findings made in this Opinion, and as expressed in the Order of May 16, 2002, the adjusted offense level and guideline sentencing range for each defendant is as follows:

Renato Mariano—18 (27 to 33 months)

Michael Serafini—20 (33 to 41 months)

Leo Del Serra—17 (24 to 30 months)

---

**20.** Certiorari was denied on November 27, 2000. *Mariani v. United States,* 531 U.S. 1010, 121 S.Ct. 564, 148 L.Ed.2d 484 (2000).

The defendants pled guilty on December 4, 2000.